**UNITED STATES FIDELITY AND GUARANTY COMPANY, L. K. Merz, Howard Gould, Robert Rowe, and John Aitken, Petitioners,**

**v.**

**The Honorable Miles W. LORD, Judge of the United States District Court for the District of Minnesota, Fourth Division, Respondent,**

**and**

**Sheila Mead and Terry Oakley, and all other persons similarly situated, and Equal Employment Opportunity Commission, Respondents.**

No. 78–1127.

United States Court of Appeals, Eighth Circuit.

Submitted May 19, 1978.

Decided Sept. 13, 1978.

Stephen D. Shawe, Shawe & Rosenthal, Baltimore, Md. (argued), Earle K. Shawe, Arthur M. Brewer and Eric Hemmendinger, Baltimore, Md., on brief, for petitioners.

Frank E. Vogl, Best & Flanagan, Minneapolis, Minn. (argued), and Thomas D. Carlson, Minneapolis, Minn., on brief, for respondents Mead, et al.

Philip B. Sklover, Atty., Equal Employment Opportunity Commission, Washington, D. C. (argued), Abner W. Sibal, Gen. Counsel, Joseph T. Eddins, Jr., Associate Gen. Counsel, and Beatrice Rosenberg, Asst. Gen. Counsel; Equal Employment Opportunity Commission, Washington, D. C., on brief, for respondent Equal Employment Opportunity Commission.

Before HEANEY, Circuit Judge, STEPHENSON, Circuit Judge, and BECKER, Senior District Judge.*

BECKER, Senior District Judge.

In this class action litigation petitioners pray for a writ of mandamus commanding the respondent (1) to limit an order of the respondent district judge, certifying a national plaintiff class, (2) "compelling" the respondent to limit to Minnesota and set a cut-off date for the class conditionally, and (3) to vacate an order permitting the Equal Employment Opportunity Commission (EEOC) to intervene in the action.

The petitioners are defendants in the civil action pending before the respondent United States District Judge in the Fourth Division of the United States District Court for the District of Minnesota. The action in question is pending on a class action complaint filed by Sheila Mead and Terry Oakley, former employees of United States Fidelity & Guaranty Company (USF&G) until January and April, 1977, respectively. The amended complaint seeks to enforce provisions of Title VII of the Civil Rights Act of 1964, on their behalf individually and on behalf of a "company-wide" class of "all female persons who have been, or are presently employed or might be employed and all past, present and future female applicants for employment at defendant USF&G offices throughout the United States . . . ." (Supplemental Appendix, "S.A." hereinafter, 3).

In the amended complaint ("complaint" hereinafter) plaintiffs Mead and Oakley allege that the defendant USF&G is a Maryland corporation, doing business in Minnesota and elsewhere in the United States (S.A. 2); that the "following company-wide practices, policies, rules, regulations, customs and usages made unlawful by Title VII, have been and continue to be uniformly instituted and/or maintained by defendant USF&G throughout all of its offices in the United States" (S.A. 3, 4); and that USF&G has discriminated and continues to discriminate against plaintiffs individually, and members of the alleged national class of female employees solely on the basis of sex (S.A. 3–8). The complaint alleges discrimination in practically every imaginable detail, including generally discriminatory denial of recruitment, training, promotion, equal pay, equal status, opportunities for transfer and employment as underwriters, outside claim adjusters, assistant supervisors, supervisors, management and higher paying "policy level positions" (S.A. 5, 6).

---

* The Honorable William H. Becker, Senior District Judge, Western District of Missouri, sitting by designation.

In Count I, ("Claim I" in complaint) plaintiffs Mead and Oakley allege discriminatory denial of their requests for training and transfer to positions of underwriters, and that they and other female employees have been segregated into clerical, secretarial, and other "non-professional, low-paying, dead-end job classifications with no promotional opportunities," in contrast to the different treatment of males (S.A. 7).

In Count I, plaintiff Mead alleges that she was pregnant in 1976; that upon learning of her pregnancy the defendants attempted to discourage her from continuing her employment by unsupported adverse reviews of her work, and by "encouraging her not to return to work following her pregnancy" (S.A. 7, 8); that USF&G delayed her return to employment, when she was ready for return, solely because of her pregnancy and denied, solely because of her pregnancy, other benefits for illness and disability, available to other employees (S.A. 7, 8).

In Count II, plaintiff Mead alleges that she filed a charge of discrimination with the EEOC in May 1976 (S.A. 8); that in retaliation the defendants harassed, intimidated and coerced her by assigning excess work to her, excessive monitoring of her work, depriving her of the assistance of other employees, making unsupported adverse reviews, denying her without just cause a raise in pay, and wrongfully discharging her within several days of receipt by her of notice of a right to sue (S.A. 8).

In Count III, plaintiff Mead alleges damage from discrimination described in Count I, and in addition discrimination in maternity benefits, measured by non-pregnancy benefits in the "company-wide group medical insurance plan" of USF&G in violation of the Minnesota Human Rights Act, as amended, Minn.Stat. 363.03 subdivision 1(2) (S.A. 9).

The individual defendants, Merz, Aitken, Gould, and Rowe, are alleged to have been, or to be presently, officers in the Minneapolis office of USF&G in which the individual plaintiffs were employed, and to have participated in the alleged discrimination.

Exhaustion of "jurisdictional and administrative remedies" of Title VII and the Minnesota Human Rights Act is alleged in the complaint.

The complaint contains allegations that the requirements of paragraphs (a), (b)(2), and (b)(3) of Rule 23 F.R.Civ.P. have been met (S.A. 3).

The relief prayed for is (a) declaration by the court that the alleged discriminatory practices are unlawful; (b) a preliminary injunction against USF&G, its agents, successors, employees, directors, officers, and attorneys from continuing the alleged unlawful practices; (c) that the court order USF&G "to make whole" plaintiffs, and members of the class, by "backpay, front pay and otherwise, all individuals who have been adversely affected" by the alleged discrimination; (d) reinstatement of plaintiff Mead to employment by USF&G, and enjoining the defendants from subjecting her to special regulations or denying her equal employment; (e) award of punitive damages against USF&G; (f) other general relief including, but not limited to, orders directing recruitment, hiring, training, promotions of plaintiffs and class members; and (g) award of attorneys' fees and costs to plaintiffs under § 2000e–5(k), Title 42 U.S.C., and Minn.Stat. 363.14, subd. 3 (S.A. 10, 11).

Before certification of the class, the district court for fourteen days heard evidence on the claim for relief of plaintiff Mead for retaliatory discharge, and found that she was constructively discharged in retaliation for her filing of charges of discrimination with the EEOC.

On November 22, 1977, the district court ordered that the action below be certified as a compulsory class action under paragraph (b)(2) of Rule 23, F.R.Civ.P., on behalf of a class defined as "all past, present, and future women employed by defendant 'USF&G' at any of its offices in the United States since July 2, [sic] 1965, and all past, present, and future female applicants for employment with defendant 'USF&G' at any of its offices in the United States since

July 5, 1965" (A. 10, 11). The minor discrepancy in the dates July 2, 1965, and July 5, 1965 (the date Title VII of the Civil Rights Act of 1964 became effective) appears to be a clerical error easily correctable.

The EEOC was granted leave to intervene as plaintiff intervenor and to file a complaint in intervention, pursuant to Rule 24(b)(1) F.R.Civ.P. and to Sections 705(g)(6) and 706(f)(1) and (3) as amended, Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*

This leave to intervene was first limited to intervention in the claim in Count II of plaintiff Mead for retaliatory discharge (A. 1–9). Later after allowing time for conciliation efforts, without results, the district court granted leave to the EEOC to intervene as a party plaintiff without restriction, after the General Counsel of EEOC certified that the action was one of general public importance, pursuant to Rule 24(b)(1) F.R.Civ.P. and Sections 705(g)(6) and 706(e) of Title VII of the Civil Rights Act of 1964 as amended, Sections 2000e–4(g)(6) and 2000e–5(f)(1), Title 42 U.S.C. (A. 12–15).

On January 13, 1978, the district court entered a carefully prepared memorandum of findings of fact, conclusions of law, and affirmation of its prior order certifying the action as a class action. The full text of this memorandum is attached hereto and entitled Addendum (A. 16–30).

After the filing of the complaint by plaintiffs Mead and Oakley, the district court consolidated an action brought by EEOC pursuant to Section 706(f)(2) of Title VII with the Mead claim for relief based on alleged retaliation. Later, the EEOC moved to intervene in the original action, alleging a pattern of nationwide discrimination. A certificate of the General Counsel of EEOC was issued certifying that the action was one of "general public importance" under Section 706(f)(1) of the EEOC Act of 1972, Section 2000e–5(f)(1), Title 42 U.S.C. The class allegations of the complaint in intervention were substantially the same as those in the (amended) complaint of Mead and Oakley. Originally, as stated above, the district court allowed the EEOC to intervene only in respect to the retaliation claim of plaintiff Mead. In respect to the complaint of nationwide discrimination, the district court stayed the action for sixty days requesting that the EEOC make a prompt offer to conciliate. After the district court extended the time for conciliation, the EEOC advised the district court that conciliation could not be achieved. In the meantime, the district court heard the retaliation claim of Mead and found from the evidence that USF&G had retaliated against Mead for filing a charge of discrimination with the EEOC. Thereafter, on the basis of affidavits of the parties, including those of EEOC, uncontroverted documentary evidence and other evidence in the trial of the retaliation claim, the district court conditionally certified the nationwide class under paragraph (b)(2) of Rule 23, retaining power to correct, modify or supplement the class action certification under paragraph (c)(1) of Rule 23 (A. 10, 11).

This order was expanded by the filing of the detailed findings of fact contained in the order set out hereinafter as an addendum (A. 16–30).

After the original certification of the class, the EEOC was permitted to intervene in the action on the complaint as a whole (A. 12–15).

Petitioner USF&G requested that the district court enter an order certifying a discretionary interlocutory appeal under Section 1292(b), Title 28 U.S.C. The district court denied this request (A. 31–37).

For the reasons stated herein, the petition for a writ of mandamus will be denied in respect to all the requests, including that the definition of the class be limited to Minnesota, that an "appropriate cut-off date" for the class be ordered, and that the order permitting EEOC to intervene be vacated.

I

*Availability of Mandamus*

Petitioner USF&G argues that under the All Writs Act, Section 1651, Title 28 U.S.C.,

mandamus is available to review the propriety of a conditional class action certification, the entry of which is discretionary. The cases cited by petitioner from this circuit do not support the contention of petitioner.

The rule in this circuit on review of interlocutory discretionary conditional class action orders is stated in *In re Cessna Aircraft Distributorship Antitrust Litigation,* (C.A. 8, 1975) 518 F.2d 213, l.c. 215–17, *cert. denied,* 423 U.S. 947, 96 S.Ct. 363, 46 L.Ed.2d 282, *reh. denied,* 423 U.S. 1039, 96 S.Ct. 577, 46 L.Ed.2d 414 (1975), in a comprehensive opinion by Judge Stephenson, as follows:

In the instant case, appellant Cessna initially argues that all orders granting class action status to cases involving substantial claims for monetary damages should be appealable under § 1291. However, the *Eisen* [*v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732] decision appears to reject such an across-the-board determination of appealability. *See* 417 U.S. at 170, 94 S.Ct. 2140. Alternatively, Cessna contends that the particular facts of this case require that we entertain this appeal in accordance with the dictates of the *Cohen* [*v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528] doctrine. Our examination of the record in this case and the nature of an order granting class action status under Rule 23 convinces us that the order here is not sufficiently "final" or "collateral" to justify appellate review at this time.

Under Rule 23 the district court is given broad discretion to determine the maintainability and the conduct of class actions. *See Wilcox v. Commerce Bank,* 474 F.2d 336, 344 (10th Cir. 1973); *City of New York v. International Pipe & Ceramics Corp.,* 410 F.2d 295, 300 (2d Cir. 1969). By the very language of the rule, any order rendered by the district court regarding the maintenance of the class action "may be considered conditional, and may be altered or amended before any decision on the merits." Fed.R.Civ.P.

23(c)(1). Thus, in discharging its obligation to assure the "fair and efficient adjudication of the controversy," the district court retains the power to establish sub-classes or to terminate the class status if subsequent developments so dictate. *See Wilcox, supra,* 474 F.2d at 344. The district court in this case specifically retained these powers in the order which granted the class status. Given these facts, it is apparent that the order here cannot be considered "final" in the manner indicated by the *Cohen* and *Eisen* decisions. (Citations omitted.)

Nor do we feel that the issue here is so divorced from the merits that effective review cannot be had after a final judgment is entered. Cessna's contentions regarding the propriety of the district court's order focus on the ability of White Industries to serve as the class representative. Cessna argues that White Industries, Inc. as a former dealer has a conflict of interest with present dealers that makes it an unfit representative. In addition, Cessna argues that the claims of price discrimination in a Robinson-Patman Act case are individualized as to each dealer and cannot be the subject of class action treatment. Obviously, if this court were to entertain these issues, it would be plunging headlong into the merits of the case. Each of these issues can be raised and fully ventilated on appeal following a final judgment. Consideration at this time would serve no justifiable judicial purpose. *See Thill Securities Corp.* [*v. New York Stock Exchange*], *supra,* 469 F.2d [14] at 15–16; *Walsh* [*v. City of Detroit*], *supra,* 412 F.2d [226] at 227.

In so holding that the order in this case is interlocutory and not appealable under § 1291, we are not suggesting that early appellate review of such orders is necessarily foreclosed in every case. For example, the district court could have certified this appeal under either § 1292(b) or Fed.R.Civ.P. 54(b) if it felt that the gravity of the class action certification issue required an expedited hearing by this court. As recently stated by the Third

Circuit in *Samuel v. University of Pittsburg,* 506 F.2d 355, 361 (3d Cir. 1974), by using these alternative means of review "the knowledge bred of the district court's proximity to the case can be brought to bear on the question of the propriety of immediate review." *See also Katz v. Carte Blanche Corp.,* 496 F.2d 747, 753–56 (3d Cir. 1974); *Hackett v. General Host Corp.,* 455 F.2d 618 (3d Cir. 1972). It is significant to note that the district court in this case refused to certify this appeal under § 1292(b).

Finally, the remedy of mandamus remains available in those extraordinary instances when the district court, in granting the maintenance of a class action, has exceeded "the sphere of its discretionary power." (Citations omitted.)

In the instant case, appellant Cessna has filed a mandamus petition as an alternative means of obtaining review by this court. The petition requests that we either direct the district court to certify the class action orders for appeal under § 1292(b) or simply reverse the lower court's granting of class action status. Nothing in the record or briefs in this case convinces us that such extraordinary relief is required. As stated by the Supreme Court in *Will* [*v. U. S.* 389 U.S. 90, 88 S.Ct. 269, 19 L.Ed.2d 305], the writ of mandamus is one of the "most potent weapons in the judicial arsenal." 389 U.S. at 107, 88 S.Ct. at 280. Where, as here, there is absolutely no showing that the district court abused its judicial power in granting the class action, this drastic action cannot be invoked. (Footnotes omitted.)

The rule of the *Cessna* case was followed in *Sperry Rand Corp. v. Larson,* (C.A. 8, 1977) 554 F.2d 868 in which the petitioner sought mandamus to compel decertification of a class certified by the district court under paragraph (b)(2) of Rule 23, as in this case. In the *Sperry Rand* case, l.c. 872, Judge Webster carefully and properly distinguished *Schmidt v. Fuller Brush Co.,* (C.A. 8, 1975) 527 F.2d 532, relied on by petitioner in this case.

The rule of the *Cessna* and *Larson* cases is consistent with the recent decisions of the Supreme Court of the United States forbidding piecemeal review of class action orders in the absence of a certification of a discretionary interlocutory appeal by a district court under Section 1292(b), Title 28 U.S.C. *Coopers & Lybrand v. Livesay,* —— U.S. ——, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978); *Gardner v. Westinghouse Broadcasting Co.,* —— U.S. ——, 98 S.Ct. 2451, 57 L.Ed.2d 364 (1978).

■ Mandamus is not available to review and control the exercise of lawfully authorized discretion by a district court. *Will v. United States,* 389 U.S. 90, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967); *Kerr v. United States District Court,* 426 U.S. 394, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976).

Petitioner complains of some alleged procedural errors of the district court. The denial of the writ of mandamus is without prejudice to the right of the petitioner to complain of any error on an authorized appeal.

The same reasons that make mandamus unavailable to compel a district court to vacate a discretionary class certification order, make the writ unavailable to limit membership in the class to persons in a particular state and to limit the class by a particular time period of employment or eligibility for employment.

■ There was ample evidence before the district court to support the exercise of its discretion to certify a national class.

If it later appears that a national class is judicially unmanageable, the district court can redefine the class or create subclasses, on its own initiative, or on motion of any party. Attention is invited to the feature paragraph (b)(3) that the provisions of the second sentence thereof relating to pertinency and manageability in subparagraph D is applicable expressly only to class actions under paragraph (b)(3). Nevertheless, it is assumed, for the purposes of this opinion, that there is an implied condition of manageability in class actions under paragraph (b)(2) also.

## II

### *Intervention by the EEOC*

There remains for determination the contention of petitioners that this court should issue mandamus to require the district court to vacate the order permitting the EEOC to intervene "on an unlimited basis." The petitioners argue in support of this contention that EEOC may expand the scope of the original action by proposing an earlier cut-off date; that the EEOC was permitted to intervene without having proceeded first through the four-step sequential processes of (1) receiving a timely charge, (2) investigating the charge, (3) determining the charge, and (4) conciliation.

In response to these arguments, the EEOC correctly argues that the district court under the applicable statutes, federal rule of civil procedure, and controlling decisions of this court, was vested with the discretionary power to permit EEOC to intervene, originally in the claim for relief of Mead based on retaliation, and later in the action of plaintiffs based on alleged nationwide discrimination.

In approaching the question of intervention, the district court followed the controlling decision of this court in *Johnson v. Nekoosa-Edwards Paper Co.* (C.A. 8, 1977) 558 F.2d 841, *cert. denied, Nekoosa Papers, Inc. v. Equal Employment Opportunity Commission,* 434 U.S. 920, 98 S.Ct. 394, 54 L.Ed.2d 276 (1977).

▪ After permitting EEOC to intervene in the retaliation claim of plaintiff Mead, the court stayed the principal action based on alleged claims of nationwide discrimination for sixty days for conciliation efforts. The stay was extended thereafter until the EEOC advised the court that conciliation was not possible. In the meantime, the General Counsel had, on behalf of the Attorney General, certified the action as one of general public importance pursuant to Section 706(f)(1) of the EEOC Act of 1972, Section 2000e–5(f)(1) Title 42 U.S.C. This section authorizes the district court to permit the EEOC to intervene in such circumstances. Rule 24(b) of the Federal Rules of Civil Procedure confirms the right of permissive discretionary intervention when "a statute of the United States confers a conditional right to intervene." In *Johnson v. Nekoosa-Edwards Paper Co., supra,* this court approved the power of the district court, in its discretion, to permit the EEOC to intervene prior to an attempt to conciliate and prior to completion of the administrative processes. While the complaint in intervention (S.A. 12–16) in this action did not substantially extend the scope of the (amended) complaint, this court, in the *Nekoosa-Edwards* case, *supra,* held that the district court, in its discretion, could permit intervention which broadened the scope of the original action. The rule of the *Nekoosa-Edwards* case, *supra,* to defer intervention of the EEOC until conciliation had failed was followed in this action by the district court.

In ruling on intervention we have emphasized the power of the district court to allow the challenged permissive intervention, in its discretion, because as demonstrated in Part I hereof, mandamus will not lie to review the exercise of a lawful discretion of a district judge, not only in class action rulings, but also in other exercises of discretion, including orders granting leave for permissive intervention.

For these reasons, the district court will not be required to vacate the order permitting the EEOC to intervene, or to limit the scope of the intervention by EEOC.

The petition for a writ of mandamus is hereby denied in respect to each prayer for relief without prejudice to their rights to assign error on an appeal authorized by law.

## ADDENDUM

### Memorandum of District Court Certifying Case as Class Action January 13, 1978.

MILES W. LORD, District Judge.

Plaintiffs Sheila Mead and Terry Oakley filed a motion, pursuant to Fed.R.Civ.P. 23, to have the class certified for the instant action. The Equal Employment Opportuni-

ty Commission supported plaintiffs' motion for class certification under Fed.R.Civ.P. 23(b). The defendants filed a memorandum of law opposing the motion.

Subsequent to a full hearing, the Court ordered that this case be maintained as a class action under Fed.R.Civ.P. 23(b)(2), and the plaintiffs were designated representatives of a class comprised of all past, present, and future women employed by defendant United States Fidelity and Guaranty Company at any of its offices in the United States since July 5, 1965, and all past, present, and future female applicants for employment with defendant United States Fidelity and Guaranty at any of its offices in the United States since July 5, 1965. This memorandum will set forth the factual and legal basis for the November 22, 1977 Order certifying the class.

I. Statement of Facts

Pursuant to the provisions of Title VII of the Civil Rights Act of 1964, this action was commenced by Sheila Mead and Terry Oakley against their employer, defendant United States Fidelity and Guaranty Company. The essential thrust of plaintiffs' complaint is that defendant USF&G has engaged and continues to engage in a pattern and practice of discriminating in employment against women.

Defendant USF&G is headquartered in Baltimore, Maryland and has fifty-eight branch offices located in thirty-eight states. Although each office varies in number of persons employed, the average size of each branch office is eighty to one hundred employees. In total, USF&G employs over 7,500 people of whom over 4,500 are women. For all of the time relevant thereto, USF&G's total workforce has been 58% or greater female. USF&G has centralized and uniform personnel policies as evidenced by the Supervisors Guide which was referred to during the course of the Mead retaliatory discharge trial. Throughout all of its offices, defendant uses the same personnel standards and forms and applies uniform personnel policies throughout its entire organization. USF&G has developed and utilized in its employment policies and practices a written job description which identifies the basic qualifications and grade for each job at USF&G.

Defendant USF&G is required, pursuant to Section 709(c) of Title VII, to file annually EEO–1 reports which show the relationship of minority and female employees to its total work force in specified job categories. Plaintiffs' counsel has consolidated defendant's EEO–1 reports for all of its offices for the year 1971 through 1975, revealing the following statistics:

| YEAR | TOTAL EMPLOYEES | MEN | WOMEN | MALE PROFS.[1] | FEMALE PROFS.[1] | MALE CLERICALS[2] | FEMALE CLERICALS[2] |
|------|------|------|------|------|------|------|------|
| 1971 | 7111 | 2944 (41.4%) | 4167 (58.6%) | 2724 (93.4%) | 192 (6.6%) | 220 (5.2%) | 3975 (94.8%) |
| 1972 | 7275 | 3018 (41.5%) | 4257 (58.5%) | 2762 (91.7%) | 251 (8.3%) | 256 (6.0%) | 4006 (94.0%) |
| 1973 | 7347 | 2973 (40.5%) | 4374 (59.5%) | 2790 (89.4%) | 332 (10.6%) | 183 (4.3%) | 4042 (95.7%) |
| 1974 | 7541 | 3010 (41.0%) | 4531 (60.0%) | 2800 (87.0%) | 416 (13.0%) | 213 (4.0%) | 4115 (95.0%) |
| 1975 | 7510 | 2967 (39.5%) | 4543 (60.5%) | 2762 (85.1%) | 485 (14.9%) | 205 (4.8%) | 4058 (95.2%) |

Source: EEO–1 Reports, 1971, 1972, 1973, 1974, 1975
Filed by USF&G for its consolidated workforce

1. The term "professional" refers to professional, technical, managerial, supervisory and like positions and includes, among others, such positions as underwriter, outside adjuster, assistant supervisor, supervisor and manager.

2. The term "clerical" refers to clerical, secretarial, stenographic and like positions and includes, among others, such positions as clerk (mail, records, messenger and code), typists, secretaries, bookkeepers and assistant underwriters.

Comparing only 1975, the most recent EEO–1 reports filed by defendant for the headquarters and each of the 58 branch offices with the relevant civilian labor force for that area, the following statistics are revealed:

| BRANCH OFFICE | TOTAL EMPLOYEES | MALE MANAGERS | | FEMALE MANAGERS | | RELEVANT CIVILIAN LABOR FORCE | |
|---|---|---|---|---|---|---|---|
| | | | | | | MEN | WOMEN |
| Albuquerque | (59) | 23 | (92.0%) | 2 | (8%) | 61.5% | 38.5% |
| Atlanta | (105) | 40 | (100%) | 0 | (0%) | 59.4% | 40.6% |
| Baltimore | (87) | 31 | (88.6%) | 4 | (11.4%) | 61.1% | 38.9% |
| Baltimore Hdq. | (1463) | 400 | (75%) | 128 | (25%) | 61.1% | 38.9% |
| Birmingham | (129) | 43 | (84.3%) | 8 | (15.7%) | 62.1% | 37.9% |
| Boston | (96) | 44 | (100%) | 0 | (0%) | 59.0% | 41.0% |
| Buffalo | (53) | 19 | (82.6%) | 4 | (17.4%) | 62.9% | 39.1% |
| Charleston | (60) | 29 | (87.9%) | 4 | (12.1%) | 64.8% | 35.2% |
| Charlotte | (59) | 24 | (96%) | 1 | (4%) | 58.6% | 41.4% |
| Chicago | (245) | 86 | (81.9%) | 19 | (18.1%) | 61.2% | 38.8% |
| Cincinnati | (62) | 22 | (84.6%) | 4 | (15.4%) | 62.5% | 35.5% |
| Cleveland | (55) | 22 | (88%) | 3 | (12%) | 62.4% | 37.6% |
| Columbia, SC | (81) | 33 | (91.6%) | 3 | (8.4%) | 58.2% | 41.8% |
| Columbus, OH | (45) | 22 | (88%) | 3 | (12%) | 59.8% | 40.2% |
| Dallas | (119) | 37 | (75.5%) | 12 | (24.5%) | 59.7% | 40.3% |
| Denver | (126) | 47 | (83.9%) | 9 | (16.1%) | 60.6% | 39.4% |
| Des Moines | (51) | 20 | (95.2%) | 1 | (4.8%) | 58.9% | 41.1% |
| Detroit | (86) | 29 | (74.4%) | 10 | (25.6%) | 64.4% | 35.6% |
| Dixon, IL | (44) | 18 | (94.7%) | 1 | (5.3%) | 47.8% | 52.2% |
| Harrisburg, PA | (48) | 45 | (93.8%) | 3 | (6.3%) | 60.4% | 39.6% |
| Hartford, CT | (86) | 31 | (91.2%) | 3 | (8.8%) | 60.3% | 39.7% |
| Helena, MT | (39) | 14 | (87.5%) | 2 | (12.5%) | 55.5% | 44.5% |
| Houston, TX | (67) | 26 | (86.6%) | 4 | (13.4%) | 63.7% | 36.3% |
| Indianapolis, IN | (185) | 54 | (79.4%) | 14 | (20.6%) | 61.1% | 38.9% |
| Jackson, MS | (28) | 17 | (94.5%) | 1 | (5.6%) | 57.7% | 42.3% |
| Jacksonville, FL | (122) | 34 | (79.1%) | 9 | (20.9%) | 58.9% | 41.1% |
| Kansas City, MO | (90) | 39 | (90.7%) | 4 | (9.3%) | 60.0% | 40.0% |
| Lansing, MI | (63) | 24 | (88.9%) | 3 | (11.1%) | 61.5% | 38.5% |
| Little Rock, AR | (73) | 30 | (90.9%) | 3 | (9.1%) | 58.8% | 41.2% |
| Los Angeles, CA | (110) | 37 | (82.2%) | 8 | (17.7%) | 61.0% | 39.0% |
| Louisville, KY | (72) | 30 | (90.9%) | 3 | (9.1%) | 61.6% | 38.4% |
| Memphis, TN | (84) | 32 | (84.2%) | 6 | (15.8%) | 60.6% | 39.4% |
| Miami, FL | (95) | 34 | (75.6%) | 11 | (24.4%) | 58.4% | 41.6% |
| Oklahoma City | (122) | 52 | (95.4%) | 3 | (5.5%) | 59.9% | 40.1% |
| Milwaukee, WI | (82) | 30 | (81.1%) | 7 | (18.9%) | 61.0% | 39.0% |
| Minneapolis, MN | (98) | 40 | (83.3%) | 8 | (16.7%) | 59.6% | 40.4% |
| Nashville, TN | (111) | 41 | (78.8%) | 11 | (21.1%) | 59.4% | 40.6% |
| New Orleans, LA | (118) | 44 | (93.7%) | 3 | (6.4%) | 62.6% | 37.4% |
| New York City | (213) | 86 | (82.7%) | 18 | (17.3%) | 60.7% | 39.3% |
| Omaha | (53) | 26 | (96.3%) | 1 | (3.7%) | 60.0% | 40.0% |
| Philadelphia | (87) | 36 | (94.7%) | 2 | (5.3%) | 61.8% | 38.2% |
| Phoenix | (69) | 27 | (91.8%) | 6 | (18.2%) | 61.3% | 38.7% |
| Pittsburgh | (70) | 28 | (87.5%) | 4 | (12.5%) | 65.7% | 34.3% |
| Portland, ME | (63) | 24 | (80%) | 6 | (20%) | 58.9% | 41.1% |
| Portland, OR | (57) | 22 | (88%) | 3 | (12%) | 61.0% | 39.0% |
| Raleigh | (98) | 31 | (77.5%) | 9 | (22.5%) | 58.0% | 42.0% |
| Richmond | (111) | 36 | (87.8%) | 5 | (12.2%) | 58.3% | 41.7% |
| Sacramento | (90) | 32 | (91.4%) | 3 | (8.6%) | 61.3% | 38.7% |
| Salt Lake City | (57) | 28 | (96.6%) | 1 | (3.4%) | 63.0% | 37.0% |
| San Antonio | (53) | 15 | (68.2%) | 7 | (31.8%) | 60.4% | 39.6% |
| San Francisco | (84) | 29 | (76.3%) | 9 | (23.7%) | 60.6% | 39.4% |
| San Jose | (58) | 22 | (84.6%) | 4 | (15.4%) | 63.1% | 36.9% |
| Scranton | (56) | 23 | (88.5%) | 3 | (11.5%) | 59.8% | 40.2% |
| Seattle | (54) | 20 | (74.1%) | 7 | (25.9%) | 62.5% | 37.5% |
| Springfield, MA | (100) | 35 | (85.4%) | 6 | (14.6%) | 59.4% | 40.6% |
| Syracuse | (85) | 29 | (85.3%) | 5 | (14.7%) | 61.6% | 38.4% |

| BRANCH OFFICE | TOTAL EMPLOYEES | MALE MANAGERS | | FEMALE MANAGERS | | RELEVANT CIVILIAN LABOR FORCE | |
|---|---|---|---|---|---|---|---|
| | | | | | | MEN | WOMEN |
| St. Louis | (118) | 43 | (71.7%) | 17 | (28.3%) | 61.4% | 38.6% |
| Toledo | (45) | 19 | (86.4%) | 3 | (13.6%) | 63.4% | 36.6% |
| Wichita | (65) | 25 | (92.6%) | 2 | (7.4%) | 61.8% | 38.2% |

Source: EEO–1 Reports, 1975
Filed by USF&G for its consolidated workforce

On March 27, 1972, plaintiff Mead commenced employment as a multi-line rate clerk/typist in the Fire and Marine Department of the Minneapolis office of defendant USF&G. In August, 1974, following graduation from Hamline University, plaintiff Terry Oakley commenced employment as a rate clerk in the Fire and Marine Department of the Minneapolis office of defendant USF&G (Tr. 1314–15).[3] During the course of her employment, she took courses in insurance at the University of Minnesota (Tr. 1315). In May and July, 1976 Mead and Oakley filed on behalf of themselves as well as all other female employees and female applicants for employment "across the board" sex discrimination charges with the Equal Employment Opportunity Commission ("EEOC") against defendant USF&G.

Mead worked for defendant until January 7, 1977 when she was unlawfully discharged for having exercised her protected rights under Title VII. (See, this Court's Findings of Fact, Conclusions of' Law, Order for Judgment On Plaintiff Mead's 704(a) Retaliatory Discharge Claim dated September 14, 1977 hereinafter cited as "Findings"). Oakley worked for defendant USF&G until April 28, 1977 when she was constructively discharged in retaliation for having filed EEO charges. (Tr. 1315–1317).

In addition to the Mead and Oakley charges, substantially identical "across the board" sex discrimination charges against defendant USF&G have been filed by Amy Quinn LaVoie (Tr. 768), Leslie Deaton (Tr. 721), and Lynn Silbernagel. Sex discrimination charges against defendant USF&G have also been raised with the EEOC by women employees in Baltimore, Des Moines, St. Louis, and Oklahoma City. See, EEOC v. USF&G, 414 F.Supp. 227 (D.Md. 1976). Furthermore, in 1974, a Commissioner's § 707 charge alleging, among other things, a pattern and practice of sex discrimination was filed against USF&G.

On May 23, 1977, the EEOC filed a Motion for Leave to Intervene as a party plaintiff in the class action of Mead and Oakley. At that same time the EEOC filed a Complaint in Intervention "quite similar to" the "across the board" sex discrimination allegations in the Mead-Oakley Complaint (Court's Memorandum and Order on Intervention dated August 15, 1977 at p. 6). Attached to the Commission's Complaint in Intervention is the Certificate of its General Counsel EEOC certifying that "the Commission has determined this action to be of general public importance in accordance with Section 706(f)(1) of Title VII. . ."

On August 15, this Court ordered the parties to engage in conciliation and "if no settlement is forthcoming by the end of the sixty day period, this Court will enter an order permitting the EEOC to expand its intervention in accordance with its Complaint in Intervention." Memorandum and Order on Jurisdiction at p. 8.[4] The parties subsequently engaged in conciliation efforts, which terminated on November 18, 1977 without settlement. On November 22,

3. References are to exhibits and transcripts of the trial before this Court on the retaliatory discharge claim of Plaintiff Mead. That matter is Claim II of the Amended Complaint.

4. The Court' reserved ruling on whether the EEOC could expand its intervention beyond its Complaint in Intervention to include other matters raised in the § 707 Commissioner's charge.

the Order certifying the case as a class action was filed. Intervention was granted on December 20, 1977.

Fed.R.Civ.P. 23(a) establishes these prerequisites to maintenance of a class action:

    (1) the class is so numerous that joinder of all members is impracticable,

    (2) there are questions of law or fact common to the class,

    (3) the claims of defenses of the representative parties are typical of the claims or defenses of the class, and

    (4) the representative parties will fairly and adequately protect the interests of the class.

In addition to the above, one of the three alternative requirements of Fed.R.Civ.P. 23(b) must be met. *Sperry Rand Corp. v. Larson*, 554 F.2d 868, 874–875 (8th Cir. 1977). The present case pleads a civil rights action brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, which seeks, among other things, declaratory and injunctive relief for the named plaintiffs as well as all women who have been, are being, or will in the future be discriminated against by defendant USF&G. This case falls squarely within subdivision (b)(2) of Rule 23 which provides:

(b) *Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole.

II. The Complaint Meets the Requirements of Rule 23(a)(1).

The Rule 23(a)(1) requirement that "the class [be] so numerous that joinder of all members is impracticable" is plainly met here. Plaintiffs seek to represent all past, present and future women employed by defendant USF&G at any of its offices in the United States since July 5, 1965.

The statistics set forth on pages 3 and 4 illustrate that over 4,500 women have a potential Title VII cause of action against common defendant.[5] These women are located in 38 different states. These undeniable facts alone establish the impossibility of joinder of all the parties. Bearing in mind that the courts have held that the Rule requires only *impracticability*, not impossibility, *Jenson v. Continental Financial Corporation*, 404 F.Supp. 806, 809 (D.Minn., 1975); the standard is obviously met.

In similar cases, class actions have been declared with far fewer class plaintiffs. See, e. g., *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (a class of 95 employees); *Horn v. Associated Wholesale Grocers*, 555 F.2d 270, 275–276 (10th Cir. 1977) (41 persons); *Arkansas Education Association v. Board of Education*, 446 F.2d 763 (8th Cir. 1971) (20 persons); *Cypress v. Newport New General*, 375 F.2d 648 (4th Cir. 1967) (18 persons).

Further, in light of the illegal retaliatory discharge of class representative Mead here, a class action is uniquely appropriate to the present circumstances due to the job jeopardy otherwise risked by an individual seeking relief. The Tenth Circuit recognized this fact in *Horn v. Associated Wholesale Grocers, supra*, 555 F.2d at 275, when it explained:

"[E]mployees are apprehensive concerning loss of jobs and the welfare of their families. They are frequently unwilling to pioneer an undertaking of this kind (a class action Title VII suit) since they are unsure as to whether the court will support them. Even if they do prevail, they are apprehensive about offending the employer as a result of taking a stand. These are all factors that enter into the impracticability issue."

Additionally, the formation of a nationwide class insures that the Court will be able to grant effective relief, should such be

---

**5.** In addition, there are numerous but uncounted former employees and applicants.

warranted, which cannot be thwarted by the inter-office transfer of employees.

## III. The Complaint Meets the Requirements of Rule 23(a)(2)

The Rule 23(a)(2) requirement that there be "questions of law or fact common to the class" is obviously present here.[6] The basic legal and factual allegation in the Complaint—which applies "across the board" to all members of plaintiffs' class—is that defendant USF&G has intentionally denied equal employment opportunity to women applying to and employed by it throughout the United States. The validity of this "across the board" approach has been recognized by the courts. See, e. g., *Senter v. General Motors Corp.*, 532 F.2d 511 (6th Cir. 1976); *Rich v. Martin Marietta Corp.*, 522 F.2d 333 (10th Cir. 1975); *Johnson v. Georgia Highway Express*, 417 F.2d 1122, 1124 (5th Cir. 1969); *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711 (7th Cir. 1969); *Jenkins v. United Gas Corp.*, 400 F.2d 28, 33 (5th Cir. 1968). See also 3B *Moore's Federal Practice* Para. 23.06–1 at P. 23–303, n. 7 and Supplement; *Developments in the Law: Employment Discrimination and Title VII of the Civil Rights Act of 1964*, 84 Harv.L. Rev. 1109, 1220 (1971).

Common questions of law and fact concerning the nature of defendant's practices which affect these class members and which raise issue under Title VII are set out in the Complaint of Mead and Oakley and the Complaint in Intervention of EEOC. These include such questions as:

(a) Whether defendant USF&G has and continues to maintain recruitment and hiring policies and practices with respect to professional trainee, professional, technical and managerial positions which unlawfully operate to deny potential female applicants, female applicants, current female employees, and past female employees equal employment opportunity because of their sex (Mead-Oakley Amended Complaint at paragraphs 6 and 8; EEOC Complaint at paragraph 9a).

(b) Whether defendant USF&G has and continues to maintain policies and practices with respect to assignment, selection, training and testing which unlawfully operate to deny potential female employees, current female employees, and past female employees equal employment opportunity because of their sex (Mead-Oakley Amended Complaint at paragraphs 7, 9 and 10; EEOC Complaint at paragraph 9b).

(c) Whether defendant USF&G has and continues to maintain policies and practices with respect to promotion and transfer which unlawfully operate to deny potential female employees, current female employees, and past female employees equal employment opportunity because of their sex (Mead-Oakley Amended Complaint at paragraphs 6 and 9; EEOC Complaint at paragraph 9c).

(d) Whether defendant USF&G has and continues to maintain policies and practices with respect to wages, internal employment opportunities, terms and conditions of employment, and privileges of employment which unlawfully operate to deny potential female employees, current female employees, and past female employees equal employment opportunity because of their sex (Mead-Oakley Amended Complaint at paragraph 5; EEOC Complaint at paragraph 9d).

(e) Whether defendant USF&G has and continues to maintain policies and practices with respect to its benefits, including maternity, which unlawfully operate to deny potential female employees, current female employees and past female employees equal

---

[6]. Professor Moore has characterized this requirement as "unnecessary, since, in addition to the prerequisites of subdivision (a), an action can be maintained as a class action under Rule 23 only if it satisfies the requirements of at least one of the three types of class actions provided by subdivision (b)." The existence of common questions is implicit in each of those three types. 3B Moore's Federal Practice Para. 23.06–1 at P. 23–301.

employment opportunity because of their sex (Mead-Oakley Amended Complaint at paragraph 5; EEOC Complaint at paragraph 9e).

(f) Whether defendant USF&G has and continues to maintain policies and practices with respect to training, promotion, assignments and transfer which operate unlawfully to deny past and present pregnant employees equal employment opportunity because of their sex (Mead-Oakley Amended Complaint at paragraph 11; EEOC Complaint at paragraph 9e).

These questions clearly show that there is a "common nucleus of operative facts" which affect all class members nation-wide, and accordingly clearly satisfies Rule 23(a)(2). *Donaldson v. Pillsbury Co.*, 554 F.2d 825, 831 n. 5 (8th Cir. 1977); *Veron J. Rockler and Co. v. Graphic Enterprises, Inc.*, 52 F.R.D. 335, 340 (D.Minn.1971). Even if certain factual disparities existed within the class, the courts have uniformly held that such disparities are superceded by the alleged operation of a pervasive discriminatory employment policy. Thus the common nucleus need not embrace *all* of the operative facts. *Johnson v. Georgia Highway Express, Inc., supra* ; *Norwalk CORE v. Norwalk Development Agency*, 395 F.2d 920 (2nd Cir. 1968). Cf., *Reed v. Arlington Hotel Co.*, 476 F.2d 721 (8th Cir. 1973); *Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421 (8th. Cir. 1970); *Jenson v. Continental Financial Corporation, supra*, 404 F.Supp. at 809–810.

### IV. The Complaint Meets the Requirements of Rule 23(a)(3).

Rule 23(a)(3) provides that a class action may be maintained only if "the claims or defenses of the representative parties are typical of the claims or defenses of the class."

Here the Complaint alleges that defendant has engaged in companywide employment practices which have had the effect of limiting job opportunities of women to low paying, undesirable positions and which discourage women from seeking employment opportunities with defendant. Statistical evidence vividly shows that defendant has consistently employed a disproportionate number of women in low-paying, undesirable positions. Among the discriminatory patterns alleged to have contributed to this condition are the following:

(a) The refusal and failure to recruit, hire, train or·promote women to higher-paying positions, particularly technical, professional, managerial and supervisory jobs.

(b) A job classification system which relegated women to clerical, secretarial and other non-professional, lower-paying positions.

(c) A transfer system which freezes women into such non-professional, lower-paying positions.

(d) The denial to pregnant women of training, assignments or promotions and discouraging them from continuing employment following their pregnancy.

Plaintiff Mead was until January 7, 1977, an assistant underwriter. She repeatedly requested training, if needed, and promotion but was denied. When Mead was pregnant during the winter of 1975–76, defendant, through its agents, attempted to discourage her from continuing her employment. See, e. g., paragraphs 27–30 this Court's Findings of Fact, Conclusions of Law, Order for Judgment on Plaintiff Mead's ¶ 704(a) Retaliatory Discharge Claim, dated September 14, 1977.

Plaintiff Oakley was, until April 28, 1977, employed as a rate clerk. She is a college graduate and took college courses in insurance in an effort to secure a better job with defendant. She repeatedly requested training, if needed, and promotion and was denied.

In short, the claims of plaintiff Mead and Oakley and the claims of the other class members emanate from the same legal theory—companywide practices which violate Title VII. Therefore, the claims of Mead and Oakley are not adverse, but rather are typical of the claims of the remaining class members, see, *Jenson v. Continental Financial Corporation, supra*, 404 F.Supp. at 811.

As observed by the court in *Leisner v. New York Telephone Co.*, 358 F.Supp. 359, 372 (S.D.N.Y.1973), in upholding a class consisting of named plaintiffs and all women employed in management level positions in the defendant's traffic departments throughout New York:

> "This pre-requisite merely states in other words the requirements of R. 23(a)(1), (a)(2), and (a)(4). See 3B J. Moore, Federal Practice ¶ 23.06–1 (1971 Supp.). It does not mean that the claims of the representatives must raise identical questions of law and fact with those raised by the claims of the rest of the class. Rule 23(a)(1) clearly indicates that one common question of law or fact can be sufficient if the other pre-requisites are satisfied. Nor is it fatal if some members of the class might prefer not to have violations of their rights remedied. See *Norwalk CORE v. Norwalk Redevelopment Agency*, 395 F.2d 920, 937 (2d Cir. 1968)."

The possible existence of individually distinct factual situations is unimportant for "Rule 23(a)(3) does not require that the claims of the representative parties and the remaining members of the class be identical." *Byrnes v. IDS Realty Trust*, 70 F.R.D. 608 (D.Minn.1976). See also, *Donaldson v. Pillsbury Co., supra*, 554 F.2d at 830. Accordingly, the requirements of Rule 23(a)(3) are met.

V. The Complaint Meets the Requirements of Rule 23(a)(4).

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." This requirement depends upon two factors: "(a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class. *Eisen v. Carlisle and Jacquelin*, 391 F.2d 555, 562 (2d Cir. 1968)." *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 247 (3rd Cir. 1975), cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679. *Accord, Jenson v. Continental Financial Corporation, supra*, 404 F.Supp. at 811.

1. Plaintiffs' attorneys are qualified, experienced and able to conduct this litigation. As evidenced by their prompt efforts to attempt to secure immediate injunctive relief prohibiting retaliation against plaintiff Mead and by their successful effort to secure permanent injunctive relief prohibiting retaliation against Mead or any other Minneapolis employee for exercising their Title VII rights, Counsel has vigorously pursued this matter to date and will continue to pursue this litigation to its conclusion. *Jenson v. Continental Financial Corporation, supra*, 404 F.Supp. at 812.[7]

The Court has granted the Petition In Intervention of the Equal Employment Opportunity Commission. Thus, the interests of the class will be protected not only by able counsel for the plaintiff, but also by the resources of the Equal Employment Opportunity Commission.

2. The interests of the present plaintiffs clearly are not antagonistic to the class. As demonstrated by the now concluded 14 days of trial, the present plaintiffs stand willing to sacrifice their own time, effort and personal reputations to pursue the Title VII rights of all women with respect to the defendant USF&G. In an attempt to set the present plaintiffs apart from other female employees of the defendant, it may allude to alleged personality conflicts previously suggested at trial. While such charges would be both unfounded and without merit they do not address the determinative question of whether differences exist over the subject matter of the lawsuit. The present plaintiff's prayer for relief is common to all females within or without the defendant organization, and as such is not antagonistic or contrary to the interests of any individual woman, regardless of her relationship to USF&G or the present plaintiffs.

In *Sperry Rand v. Larson, supra*, 554 F.2d at 873–874, the Eighth Circuit *rejected* a claim that the plaintiff in a Title VII class

---

7. Having the resources, experience and tenacity it does, intervening-plaintiff EEOC obviously meets this criterion. Intervening-plaintiff EEOC supports this motion.

action had interests antagonistic to the class members. There, the defendants (the employer, the Local Union and its International al Union) claimed that plaintiffs, as past union officials, engaged in activities in and out of office that were inconsistent with the interests of the class.[8] The Court concluded that the frictions did not reach the subject matter of the suit, that the plaintiffs' past history as union officials would not preclude vigorous prosecutions of the claims of class-based discrimination, that the evidence of lack of enthusiasm by other union employees was not reliable and in any event was not controlling, and that plaintiffs' private motives would not affect the merits of the case. In short, there was not antagonism between the plaintiffs and other class members which went to "the subject matter" of the lawsuit.

Here the interests of Mead and Oakley in combatting the sexually discriminatory policies of the defendant surely are coextensive with all past, present and future female employees and with all past, present and future female applicants for employment. The relief sought—whether in the form of front pay, back pay, mandatory hiring of women into better paying jobs such as professional, technical, managerial and supervisory positions, or increased promotional opportunities for women—will benefit all members of the class. *Wetzel v. Liberty Mutual Insurance Co., supra,* 508 F.2d 247–248, cf. *Jenson v. Continental Financial Corporation, supra,* 404 F.Supp. at 811.

Finally, defendant may argue that Mead and Oakley are not adequate representatives because they are no longer employees. That contention is patently without merit. Mead was found by this Court to have been unlawfully discharged. Under this Court's

Order, she may elect to be reinstated. Oakley was constructively discharged in retaliation for having exercised her Title VII rights to file a charge with the EEOC. Moreover, it is well settled that, even if the class representatives are no longer employees, they may nonetheless be adequate representatives of a class of past and present employees. *See, e. g., Donaldson v. Pillsbury Co., supra,* 554 F.2d at 831, n. 5; *Wetzel v. Liberty Mutual Insurance Co., supra,* 508 F.2d at 723; *Parham v. Southwestern Bell Telephone, supra,* 433 F.2d at 428; *Reed v. Arlington Hotel Company, Inc., supra,* 476 F.2d at 723.

The Third Circuit has even held that former employees make better class representatives. In *Wetzel* the Court declared:

"former employees of the company, being familiar with [the company's] employment practices and being free from any possible coercive influence of management, [the plaintiffs] are better situated than either job applicants or present employees to present an intelligent and strongly adverse case against [the company's] alleged discriminatory practices" [quoting from *Mack v. General Electric Co.,* 329 F.Supp. 72, 76 (E.D.Pa.1975)]. *Id.* at 247.

The Court further explained why "present employment" should not be a condition of serving as a class representative:

"Moreover, were the position advanced by Liberty Mutual adopted, *employers would be encouraged to discharge those employees suspected as most likely to initiate a Title VII suit in the expectation that such employees would thereby be rendered incapable of bringing the suit as a class action.*" *Id.* (Emphasis supplied).

---

8. Five alleged sources of antagonism between the representatives and the class were:

1) Intra-union disputes which occurred from 1968–1970 while plaintiffs were union officers;

2) Plaintiffs, as former union officers, might be called as witnesses to defend the Local against charges that it is liable for discriminatory practices that occurred during the time they were in office;

3) Plaintiffs were suspended from office in 1970 by the defendant International and prohibited from holding office for five years, thus suggesting an ulterior motive for the Title VII suits;

4) The class did not support the suit as evidenced by a unanimous union members vote and by unsolicited petitions; and

5) The prospect that the plaintiffs might use the lawsuit to advance their political ambitions within the union.

In sum, plaintiffs Mead and Oakley and their counsel have vigorously pursued this matter to date and will continue to represent the class fairly and adequately to the conclusion of this litigation. Accordingly, plaintiffs have met the requirement of Rule 23(a)(4).

## VI. The Complaint Satisfies All the Requirements of a Class Action Under Rule 23(b)(2).

Rule 23(b)(2) permits a suit to be maintained as a class action where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." The Advisory Committee's Note to Proposed Amendments to Rule 23 expressly observes that subdivision (b)(2) is especially appropriate "in the civil rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration." 39 F.R.D. 69, 102 (1966).

Consistent with that statement, the Eighth Circuit recently ruled that,

Rule 23(b)(2) certification is appropriate when plaintiffs seek injunctive relief from acts of an employer 'on [the] grounds generally applicable to the class'. Sex discrimination in employment is such a ground. See *Donaldson v. Pillsbury Co.*, 554 F.2d 825 (8th Cir. 1977); *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711 (7th Cir. 1969). That back pay may be a form of relief sought incidental to injunctive relief will not preclude certification under Rule 23(b)(2). *Senter v. General Motors Corp.*, 532 F.2d 511, 525 (6th Cir.), cert. denied, [429 U.S. 870,] 97 S.Ct. 182, [50 L.Ed.2d 150] (1976); *Society for Individual Rights, Inc. v. Hampton*, 528 F.2d 905, 906 (9th Cir. 1975); *Rich v. Martin Marietta Corp.*, 522 F.2d 333, 341 (10th Cir. 1975); *Jones v. Diamond*, 519 F.2d 1090, 1100 (5th Cir. 1975); *Nix v. Grand Lodge of Int'l Ass'n of Machinists*, 479 F.2d 382, 385 (5th Cir.), cert. denied, 414 U.S. 1024, 94 S.Ct. 449, 38 L.Ed.2d 316 (1973); *Robinson v. Lorillard Corp.*, 444 F.2d 791, 802 (4th Cir.), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); *Bowe v. Colgate-Palmolive Co., supra*, 416 F.2d at 720; *Rodriguez v. Swank*, 318 F.Supp. 289, 295 (N.D.Ill.1970), aff'd without opinion, 403 U.S. 901, 91 S.Ct. 2202, 29 L.Ed.2d 677 (1971). *Sperry Rand v. Larson, supra*, 554 F.2d at 875.

See also, *Wetzel v. Liberty Mutual Insurance Co., supra*, 508 F.2d at 250–253; *Gilbert v. General Electric Co.*, 519 F.2d 661 (4th Cir. 1975); *Head v. Timken Roller Bearing Co.*, 486 F.2d 870, 876 n. 6 (6th Cir. 1973).[9]

Defendant USF&G's unlawful employment policies governing such matters as hiring, recruiting, classifying, training and promotion which are challenged by plaintiffs' Complaint here are applied by defendant against women "across the board" regardless of geographic location. Consequently, final injunctive and declaratory relief with respect to the class as a whole is appropriate. Accordingly, plaintiffs have met the requirements of Rule 23(b)(2).[10]

For the foregoing reasons the Court declares that this action is appropriately maintainable as a class action under Fed.R. Civ.P. 23.

---

**9.** The commentators also agree that Title VII class actions should be certified under Rule 23(b)(2) even though equitable relief ordered may include back pay awards. 3B Moore's Federal Practice Para. 23.04 at 23–651, n. 7; Wright & Miller, Federal Practice & Procedure: Civil § 1776 nn. 68 and 69. Back pay awards under Title VII are in nature of equitable relief, *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 416–417, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

**10.** Plaintiffs also satisfy the prerequisites of other 23(b) subdivisions, see, *Wetzel v. Liberty Mutual Insurance Co., supra*, 508 F.2d at 252.