Sarah L. ABRON, Appellee,

v.

BLACK & DECKER (U.S.)
INC., Appellant.

No. 79–1871.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 8, 1980.

Decided July 17, 1981.

Stephen D. Shawe, Arthur M. Brewer, Baltimore, Md. (Earle K. Shawe, Eric Hemmendinger, Shawe & Rosenthal, Baltimore, Md., on brief), for appellant.

Norris C. Ramsey, Baltimore, Md. (Karon D. Ramsey, Baltimore, Md., on brief), for appellee.

Mark S. Flynn, E. E. O. C., Washington, D. C. (Leroy D. Clark, Gen. Counsel, Joseph T. Eddins, Jr., Associate Gen. Counsel, Lutz Alexander Prager, Vincent Blackwood, Washington, D. C., on brief), for amicus curiae.

Before BUTZNER, RUSSELL and MURNAGHAN, Circuit Judges.

PER CURIAM:

Invoking both Title VII, 42 U.S.C. § 2000e, et seq., and § 1981, 42 U.S.C., the plaintiff, a black woman, has filed this discrimination suit against her former employer, the defendant Black & Decker. In her complaint she asserts both an individual and a broad class wide claim. Her individual claim of discriminatory treatment consisted of the denial by the employer of her request, upon return to work after medical leave, for a temporary transfer to light work for reasons of health as recommended by her physician, although she contended it was routine for white employees to be granted temporary transfers in such circumstances. The allegations in support of the class wide action followed the broad across-the-board allegations of employment discriminations made by the plaintiff in *Barnett v. W. T. Grant Company,* 518 F.2d 543 (4th Cir. 1975). The defendant initially moved to strike the allegations of across-the-board discrimination, both on the ground that the plaintiff lacked standing to assert such a claim, and on the ground that the claim was beyond the scope of either her charge as filed with the Maryland Commission on Human Relations or as encompassed within the investigation of such charge by the Commission. The district court denied the motion on both grounds.[1]

The plaintiff countered these motions of the defendant with her own motion for class certification. After argument, the district court overruled the defendant's objections to this motion of the plaintiff and granted certification. It defined the class certified as "all black persons who either have been employed, are currently employed, or will be employed, or will seek to be employed by the Black & Decker Manufacturing Company at its Hampstead, Maryland, plant, on or after January 31, 1971" and designated the "aspects of employment * * * [to] be considered in regard to the charge of discrimination [to] include: recruitment, job classification; hiring; assignment; promotion; transfer; discipline; discharge; benefits; apprenticeship training programs; compensation; terms, conditions and privileges of employment." The district court then severed for trial the issues of liability and back pay and proceeded to trial on the issue of liability.

At the conclusion of the trial on liability, the district court found racial discrimination in the treatment by the defendant of plaintiff's request for lighter work upon her return to work after a medical leave. This treatment, it found, warranted the plaintiff's action in quitting. In her attempt to prove a class action, the plaintiff relied basically on statistical employment of evidence,[2] analyzed in connection with the

---

1. While the defendant has appealed the denial of this motion, it is unnecessary to consider such point in view of our subsequent disposition of the class certification issue.

2. For a late statement on the proper use of statistical evidence in this context, see *Beazer v. New York City Transit Authority,* 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979). For a comment on the rule as announced in that case, see Friedman, *The Burger Court and the Prima Facie Case in Employment Discrimina-*

*tion Litigation: A Critique,* 65 *Cornell L.Rev.* 1 at 50:

"The rigorous standard for statistical proof of discriminatory impact reflected in the *Beazer* opinion suggests that the Court is ignoring its prior decisions and reformulating its position on this critical issue. If *Beazer* foreshadows the rejection of the use of general population data and the limitation of the presentation of statistics restricted to those of actual applicants and employees, it repre-

Maryland Standard Metropolitan Statistical Analysis (SMSA),[3] and the district court rested its finding of class discrimination in hiring, recruitment, assignment and classification, promotion and transfer (permanent), and operation of the apprenticeship program substantially on the same statistical evidence. On the basis of its findings of class discrimination, the district court ordered the defendant to develop a program of affirmative action which should have as its "appropriate general goal" the achievement of "a percentage of black employment in the basic EEO categories equal to one half the figures for experienced black employment in the Baltimore SMSA reported in the 1970 census."[4] It, also, ordered the development of "a system of regular, active and intensive recruiting at high schools, secretarial and vocational schools within Baltimore City with the purpose of attracting qualified black applicants to work at the Hampstead plant; particularly in the crafts, mechanical, and clerical areas." The Court further established a procedure whereby any employee who had not received a promotion or transfer as requested might file a claim based on such denial, whereupon the defendant would have "the burden of proving * * * that claimants are not eligible for the job for which they claim to have been denied promotion or transfer * * *." The defendant was ordered to "periodically notify" not only all "[c]urrently employed black employees," but also the NAACP and the Urban League of its progression in its affirmative action program. It concluded by awarding attorney's fees to plaintiff's counsel.

In its final order at this stage of the proceeding, the district court, 439 F.Supp. 1095, pursuant to 28 U.S.C. § 1292(b), granted leave to either of the parties to apply to this Court "for leave to appeal" any of the several orders entered in the action. Upon petition this Court granted leave to appeal and the various orders of the district court are before us for review. We affirm in part, reverse and remand in part.

■ The critical issue on appeal is the matter of class certification and not the plaintiff's individual claim. We recognize the strength of the defendant's argument against the plaintiff's individual claim but it was a claim that rested on disputed facts, which were resolved adversely to the plaintiff's position by the district court. We are unable to hold the findings of the district court on these disputed facts clearly erroneous and thus we affirm the findings and conclusions of the district court on the plaintiff's individual claim. We are, however, constrained by controlling decisions of the Supreme Court and of this Court to reverse the class certification made in this

sents the imposition of another onerous burden upon the prosecution of *Griggs*-type claims."

3. One of the contested issues in the case was the propriety of relying on the Maryland Standard Metropolitan Statistical Analysis for the plaintiff's claim of class discrimination. It was the defendant's position that its use was disproportionately weighed in favor of the plaintiff by the improper inclusion in such analysis of the racial divisions in the population of the City of Baltimore. The defendant's plant was located some thirty miles from the City of Baltimore and was not served by any main highway from that City. Out of a work force at such plant that fluctuated from 2400 to over 3000, less than 75 lived in the City of Baltimore and of this number little more than a third were black. The City of Baltimore had approximately 88% of the black population which was included in the Maryland Standard Metropolitan Statistical Analysis. Thus, it was solely the

inclusion of the City of Baltimore as a logical area from which the defendant could be expected to draw its work force that, according to the defendant, enabled the district court to find a prima facie case of discriminatory impact in this class action.

4. The district court apparently recognized some question about the reasonableness of including the City of Baltimore in assessing a defendant's reasonable employment force and thus sought to compensate for this by discounting the effect of such inclusion on the affirmative action quota. But the court took no note of the fact that, by including the City of Baltimore, with its overwhelming concentration of black population (as contrasted with the rest of the SMSA), it was possibly overcompensating for that inclusion by the effect it gave to the figures for black population in the City of Baltimore.

case and to set aside accordingly the findings and conclusions of liability, together with the relief granted by the district court in connection with the class claim.

 The governing principles on the right of a plaintiff to maintain a class action were stated recently in *East Texas Motor Freight v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). In that case, the individual claim of discrimination by the plaintiffs was the refusal of the San Antonio terminal manager of the defendant trucking line to approve their applications for transfer to "road" jobs.[5] The question was whether such plaintiffs, with the unique claim of discrimination, could mount a class action concerning discrimination in initial job assignments.[6] The Court answered the question in the negative, saying the plaintiffs "were not members of the class of discriminatees they purported to represent."[7] It proceeded to declare that a class action may be maintained only by persons " 'possess[ing] the same interest and suffer[ing] the same injury' as the class members;"[8] and that, since the plaintiffs in this particular case had suffered no discrimination in their hiring or

initial assignment, they were in no position to mount a classwide attack on the hiring or initial assignment policies of the employer.[9]

We followed *Rodriguez* in *Hill v. Western Elec. Co., Inc.*, 596 F.2d 99 (4th Cir. 1979).[10] As we have said there, "[i]n *Rodriguez*, the Supreme Court emphasized that a class representative must 'possess the same interest[s] and suffer the same injury' as the class members they seek to represent."[11] We accordingly held in *Hill* that plaintiffs complaining of racial discrimination suffered by them in assignments and promotions could not represent as class representatives persons denied employment on racial grounds. That case is dispositive against class certification in this case on any ground other than that for which plaintiff claims to have suffered injury (*i.e.*, temporary assignment for medical reasons to lighter work).

The plaintiff has never asserted any claim of discrimination other than in the denial of a *temporary* transfer to light work on the basis of a doctor's certificate. That was the claim she set forth in her charge filed with the Maryland Commission on Human Affairs.[12] It was the claim investigat-

---

5. *Id.*, 403–04, 97 S.Ct., at 1896.

6. *Id.*, 404, 97 S.Ct., at 1897.

7. *Id.*, 403, 97 S.Ct., at 1896.

8. *Id.*, 403, 97 S.Ct., at 1896.

9. *Id.*, 404, 97 S.Ct., at 1897.

10. Earlier in both *Shelton v. Pargo, Inc.*, 582 F.2d 1298, at 1312–13 (4th Cir. 1978), and in *Belcher v. Bassett Furniture Industries, Inc.*, 588 F.2d 904, 906, n. 3 (4th Cir. 1978), we had recognized that *Rodriguez* denied a plaintiff the right to maintain a class action (with respect to) "a discrimination practice to which [he] had not personally been subjected."

11. *Id.*, 101.
For other decisions reaching the same result and adopting the same construction of *Rodriguez, see DeGrace v. Rumsfeld*, 614 F.2d 796, 809 (1st Cir. 1980), *Scott v. University of Delaware*, 601 F.2d 76, 87 (3d Cir. 1979), and *Johnson v. American Credit Co. of Georgia*, 581 F.2d 526, 532 (5th Cir. 1978).
In *Scott*, the Court said:
"Several courts have held that a named plaintiff who challenges a defendant's discriminatory *promotion* practices may not

represent a class contesting the defendant's *hiring* practices because these claims are insufficiently similar." (Italics in opinion.) n. 23.
In *Johnson v. American Credit Co.*, Judge Wisdom said:
"A fundamental requirement is that the representative plaintiff must be a member of the class she wishes to represent. *See East Texas Motor Freight System, Inc. v. Rodriguez*, 1977, 431 U.S. 395, 403, 97 S.Ct. 1891 [1896], 52 L.Ed.2d 453; 7 C. Wright & A. Miller, § 1761. For her third constitutional challenge, then, Johnson may represent only a subclass consisting of all persons who, like her, have had or will have property attached prior to judgment because they allegedly were removing the property from the state. No challenge may be raised in this action to the other five situations that give rise to attachment under the Georgia statutes, because there are no representative plaintiffs present who have been aggrieved by them and thus who can represent the appropriate subclasses." pp. 532–33.

12. "Complainant is a Black female who, due to medical reasons, requested a transfer to lighter job duties. She stated that whites were granted transfers for this reason while

ed by the Commission and it was the claim on which that Commission made a finding of probable cause.[13] The investigation by the Maryland Commission revealed only five other like requests for temporary transfers for medical reasons by employees of the defendant and all were granted.[14] It was plaintiff's claim that hers was the only such request that had ever been denied. Her claim was thus a solitary one that could not support a class certification. Nor, for that matter, did the district court certify a class embracing the plaintiff's specific claim.

The class primarily certified by the district court embraced discriminatees in hiring, and the affirmative action ordered by the district court in its order was basically directed at hiring practices. The plaintiff, however, suffered no injury as a result of any such practices. By her testimony, she applied for work and was promptly hired. She lacked any standing to represent a class of persons who had been denied employment, whether affirmatively or by reason of a failure to recruit. She had never requested a transfer, except a *temporary* one until she regained her full health. She filed no request for promotion and was denied it. In her testimony she made no reference to the apprenticeship program nor had she stated it as a ground of her complaint as filed with the Commission. Never having been discriminated against in hiring, or recruitment, or promotion, or inclusion in the apprenticeship, or transfers (except for the unique one she asserted), there was no basis for a class certification in the case. It follows that, without any authority for a

class certification,[15] the district court erred in certifying a class and in granting any relief on the basis of such erroneous certification. The cause is accordingly remanded, with instructions to grant plaintiff relief on her individual claim, but to set aside and void all class relief granted. It follows, too, that the award of attorney's fees, the amount of which was unquestionably determined by the class action aspect of the case, is remanded to the district court for reconsideration in the light of the foregoing disposition of the class action.

*AFFIRMED IN PART, VACATED IN PART,* and *REMANDED IN PART.*

MURNAGHAN, Circuit Judge, dissenting:

The majority holds that an employee who suffers racial discrimination as a result of her employer's employment practices may not bring a class action and serve as the representative of a class consisting of other employees or would be employees who endure non-identical injuries. Today's holding marks a pronounced withdrawal from the principles of Title VII by requiring the fragmentation of employees' claims, all of which challenge racially discriminatory internal employment practices of the employer. The majority opinion grafts onto Rule 23 of the Federal Rules of Civil Procedure a procedural barrier which will effectively limit the substantive rights of minority employees under Title VII. Because I believe that an employee who suffers race discrimination as a result of his employer's practices ought to be able to represent other employ-

---

she was denied. Complainant filed a complaint which stated that she was denied a transfer to lighter duties based upon her race, which is Black."

13. " * * * there is evidence supportive of the Complainant's allegations that whites were offered light job duties by their supervisors after returning to work from medical leave, as compared to the Complainant, who was treated differently. Whites were transferred from job duties that required them to stand to job duties that required them to be seated. Most of them were transferred to either the 'accessory table' or 'blister machine'. The treatment of the Complaint with regard to

her request for transfer due to medical reasons was different than that of whites."
" * * * The Commission's staff finds that probable cause exists to believe that the Complainant was discriminated against by the Respondent by denying her a light duty transfer, as whites were allowed, on the basis of her race, which is Black, * * *."

14. Four of these were by white employees and one by a black employee.

15. It should be said, in fairness to the district court, that its decision preceded *Rodriguez, Hill, Pargo,* and *Belcher.*

ees or would be employees suffering employment discrimination emanating from the same source, i. e. common to both the representative and the represented, I dissent.

## I.

The facts of the case illustrate what is at stake. Sarah Abron is a black woman hired by Black & Decker in July, 1970, to perform low-level assembly line work. Her job required her to stand. In the Fall of 1971, she suffered a miscarriage and was away from work on medical leave until February 1972. Upon her return, she brought a letter from her doctor indicating she should be assigned to "light duty" work. Black & Decker's policy for obtaining a temporary medical transfer directed the employee to make an informal request of his or her supervisor "who, if he is not in a position to fulfill the request, refers that person to the Safety and Health Department." However, despite her requests, Abron's supervisors failed either to provide sit-down work or to refer her to the Safety and Health Department.

Through it all, Abron remained at her post. In March, 1972, Abron underwent an operation and was on medical leave for four months. In July, 1972, she returned to work with a letter from her physician again requesting light duty work. Again her supervisors failed to provide such work, although it was available and although several whites with doctors' letters testified that they had so been temporarily transferred. Again, Abron was not referred to the Safety and Health Department.

Instead Black & Decker assigned her to a stand up packing job which required her to stretch and bend. Unable to continue working under such conditions, Abron left the Company shortly afterwards. Believing

she had been the victim of race discrimination, Abron filed a complaint with the Maryland Commission on Human Rights and subsequently filed the present lawsuit on behalf of herself and a class composed of Black & Decker past, present and future employees and applicants for employment.

Proof at trial exposed an extensive, plant-wide pattern of discrimination in Black & Decker's employment practices. In the words of the district judge, "a clear picture" emerged at trial "of dramatic continued underhiring of blacks at [Black & Decker] in all categories above that of laborer," the lowest employee rank. Although located within the Baltimore Standard Metropolitan Statistical Area (SMSA) of which blacks comprised 22% of the experienced labor force, in 1977, of Black & Decker's 2500 employees, only 3% were black.[1] The district court found a continuing failure to hire blacks at entry level jobs. Although Black & Decker recruited at many high schools at distances further away, it failed to recruit at predominantly black high schools located in Baltimore City. The district judge was "persuaded that the defendant has intentionally omitted Baltimore City from its regular recruitment area." In recruiting new employees, Black & Decker relied heavily upon applications submitted by friends and relatives of current employees, which served to perpetuate the discriminatory effects of the already heavily white plant work-force. *See Parham v. Southwestern Bell Tel. Co.*, 433 F.2d 421 (8th Cir. 1970).

The racially discriminatory hiring and recruitment practices of Black & Decker were exacerbated by within-plant discrimination as well. When an applicant was employed, the personnel office made the determination as to which of in excess of 30 departments the hiree would be assigned. In

1. Because Black & Decker is located outside of the City of Baltimore, where a large percentage of the SMSA blacks reside, the district court compensated for including the entire city in its calculation by setting a minority hiring goal of one-half of the percentage of minorities in the Baltimore area SMSA. The lower court found that the Baltimore SMSA was a proper comparison because (a) the City of Baltimore was within a reasonable commuting distance of the plant, (b) a significant number of employees commuted from the City, and other neighboring counties some distance away from the plant, and (c) Black & Decker's own actions indicated that it did not consider Baltimore City outside its employment region.

1971, blacks were not assigned to 21 of 35 departments (60%), and in 1975, 15 of 36 departments (42%). Black & Decker's assignment policies have resulted in a heavy concentration of black employees in the packaging and packing departments, and janitorial jobs, all of which are low-paying positions aptly characterized by the district court as "dead end." When Black & Decker's personnel manager was asked why, although blacks comprised barely 3% of the workforce, 67.4% of the custodians in 1965 were black, he suggested that fewer whites who came in "had indicated a particular interest in that job."

Further, Black & Decker's transfer and promotion policies were sufficiently discriminatory to lead the district court, after an extensive review of the evidence, to conclude that "blacks hired in the same year as whites at Black & Decker have not achieved the same job grades while doing the same job and have not been moving at the same rate through and out of the initial entry level ranks into the better employment levels." Notices of vacancies were not posted, supervisors were ignorant of job availability in other departments, and transfers were often effected before many employees who might have been interested heard of their availability. As stated in *Brown v. Gaston County Dyeing Mach. Co.*, 457 F.2d 1377, 1382–83 (4th Cir.), *cert. denied*, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972), "delay in learning about a vacancy in an all white category may in itself discriminate against a black employee who hears of it only after it has been filled." Furthermore, at the time Ms. Abron filed her complaint with the EEOC, no black had ever served as a supervisor at Black & Decker. In summary, the facts disclosed at trial revealed an extensive, cohesive pattern of racially discriminatory employment practices that permeated Black & Decker's workplace.

## II.

### A.

The majority, without identifying which part of the rule so provides, decides that Rule 23 forecloses one employee discrimina-

torily denied a temporary transfer from representing a class that includes employees denied, for example, permanent transfers or promotions, even though all class members work in the same facility for the same company and management, labor under identical rules and regulations governing the terms and conditions of employment, and share a common interest in having and benefiting from a workplace free of a common set of racially discriminatory employment practices, any one of which affects each class member either now or in the future. Rule 23 and Title VII direct courts to focus on the common interests and common claims that a class as a whole desires to vindicate. Nevertheless, the majority focuses instead on the purportedly distinctive manifestations of the common pattern and practice of race discrimination. It concludes that a denial of a temporary transfer "differs" sufficiently from denial of a permanent transfer, even though the same pervasive racial discrimination has led to both, that the person suffering the one indignity lacks the capacity to represent the victim of the other. At issue, however, is whether the "difference" identified by the majority is truly one of kind rather than merely of degree, and whether it should suffice to disqualify Ms. Abron from acting as a representative of other employees in a Title VII class action.

The Fourth Circuit has addressed the issue very clearly a number of times. In *Barnett v. W. T. Grant Co.*, 518 F.2d 543 (4th Cir. 1975), we determined that the lower court had erred by not permitting a representative claiming discriminatory treatment to challenge all of the defendant's employment practices, and not just those of which he had personally suffered the brunt. ". . . Barnett directed his attack at discriminatory policies of defendants manifested in various actions, and as one who has allegedly been aggrieved by some of those actions he has demonstrated a sufficient nexus to enable him to represent others who have suffered from *different actions motivated by the same policies.*" 518 F.2d at 548 (emphasis supplied). Spe-

cifically, in *Barnett* we held that a named plaintiff who claimed to have suffered racial discrimination as a result of his employer's failure to transfer him into another job, fitting "comfortably within the requirements of Rule 23(b)(2)," must be permitted to represent current, past and future employees in an " 'across-the-board' attack on all discriminatory policies and actions by defendants on the ground of race." 518 F.2d at 547. *See also Russell v. American Tobacco Co.*, 528 F.2d 357, 365 (4th Cir. 1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1666, 48 L.Ed.2d 176 (1976); *Brown v. Gaston County Dyeing Mach. Co., supra*, 457 F.2d 1377; *Young v. Edgcomb Steel Co.*, 363 F.Supp. 961, 967 (M.D.N.C.1973) (certifying the class as "all blacks who are past, present or prospective employees" over the defendant's assertion that it should be restricted "to only those blacks who have sought and been denied transfers"), *modified as to a different point*, 499 F.2d 97 (4th Cir. 1974).

*Barnett* would clearly authorize the plaintiff in the instant action to litigate claims on behalf of a broad class of employees and non-employees. However, dispatching *Barnett* as outmoded, the majority points to the subsequent cases of *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), and *Hill v. Western Electric Co., Inc.*, 596 F.2d 99 (4th Cir. 1979), *cert. denied*, 444 U.S. 929, 100 S.Ct. 271, 62 L.Ed.2d 186 (1979), as authority for departing from *Barnett*. However, with respect, I submit that neither case provides the support the majority ascribes to it.

*Rodriguez* involved three Mexican-Americans who charged that their employer, a trucking company, had discriminatorily refused to transfer them from local switching operations to "road" jobs. The complaint denominated the cause as a class action. Yet the plaintiffs never moved for class certification in the trial court. The case proceeded to trial solely on the individual

claims[2] of the three plaintiffs, all of which the trial judge, at the close of all the evidence, decided, on the merits, adversely to the plaintiffs. Belatedly waking up to their serious omission and its fatal consequences, the plaintiffs, although by now determined to have suffered no discrimination of any kind, sought class action certification. The Supreme Court ruled that, when it had been fully and finally determined at a trial on the merits addressed exclusively to the individual claims of the named plaintiffs that the plaintiffs had not suffered any discrimination whatever, they were not eligible candidates to serve in a representative capacity to push claims of discrimination allegedly suffered by others, for whom no class had as yet even been certified

> for the simple reason that it was evident ... that the named plaintiffs were not proper class representatives under Fed. Rule Civ.Proc. 23(a) .... [because] the *trial court proceedings* made clear that Rodriguez, Perez and Herrera were not members of the class of discriminatees they purported to represent.

431 U.S. at 403, 97 S.Ct. at 1896 (emphasis supplied). In short, the trial revealed that the plaintiffs "could have suffered *no* injury as a result of the alleged discriminatory practices, and they were, therefore, simply not eligible to represent a class of persons who *did* allegedly suffer injury." 431 U.S. at 403–04, 97 S.Ct. at 1896 (emphasis supplied).

Had the plaintiffs timely sought certification before a trial on the merits, and, on the basis of allegations in the complaint and the results of pretrial discovery, certification had been granted, the case would have come out quite differently. In that event, the class, having come into existence, would have survived adverse determination on the merits on the plaintiffs' individual claims. For in that case the class claims would also have been tried on the merits. The Supreme Court was explicit on that point.[3]

---

2. Those claims were restricted solely to alleged wrongful failure to transfer, for the plaintiffs stipulated that they had not been discriminated against in their initial hire.

3. In footnote 12 (431 U.S. at 406, 97 S.Ct. at 1898), the Court stated:

*Rodriguez* thus stands for the proposition that, before a plaintiff may represent a class of alleged discriminatees, he or she must have suffered discrimination in *some* respect; where pre-certification trial court proceedings fully demonstrate that the putative class representative has suffered no injury, he or she is not a member of the injured class and therefore cannot represent the class.

We have ourselves ruled the same way a number of times. *See, e. g., Goodman v. Schlesinger*, 584 F.2d 1325 (4th Cir. 1978); *Cox v. Babcock & Wilcox*, 471 F.2d 13 (4th Cir. 1972).[4]

The present case is the very antithesis of *Rodriguez*. In *Rodriguez* the Court was speaking to a situation in which putative class representatives were knocked out of the box before they even moved for class certification. That disqualified them from seeking class certification. Plaintiff Abron, on the contrary, has prevailed on the merits, as the majority affirmance of her individual claim of discrimination attests. Furthermore, she sought and obtained class certification before the trial on the merits, and, at the trial, properly acting in a representative capacity, established the existence of widespread, pervasive plant-wide discrimination.[5]

### B.

Thus ranging well beyond *Rodriguez'* facts and holding, the majority looks for support to a boilerplate generalization found in *Rodriguez*: "a class representative must be a part of the class and 'possess the same interest and suffer the same injury' as the class members." 431 U.S. at 403, 97 S.Ct. at 1896; *see* maj. op. *supra* at 954. For at least two reasons, the language, especially bearing in mind the context in which it appeared, does not support the majority's position. First, the "requirement" that a class representative must be a member of the class and possess the "same interest" and suffer the "same injury" as class members has coexisted harmoniously with "across-the-board" Title VII challenges for far too long for it suddenly to acquire such a novel interpretation as that assigned by the majority, an interpretation that forecloses any broad based race discrimination challenges. *Rodriguez*, of course, afforded no appraisal or assessment of the meaning of "same" interest or "same" injury, for it dealt only with putative representatives who possessed no interest and no injury. *Ex hypothesi any* interest or *any* injury had to be different. It asks too much of the generalization to claim for it a complete reversal of an established principle in no way involved in the *Rodriguez* case.

To show how long "the same interest" and "the same injury", or its substantial equivalents, had been around without being thought to possess the straightened meaning the majority has sought to ascribe to those terms, consider that, in 1974, the Supreme Court decided *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216, 94 S.Ct. 2925, 2929, 41 L.Ed.2d 706 (1974), in which it stated: "[T]o have stand-

---

Obviously, a different case would be presented if the District Court had certified a class and only later had it appeared that the named plaintiffs were not class members or were otherwise inappropriate class representatives. In such a case, the class claims would have already been tried, and, provided the initial certification was proper and decertification not appropriate, the claims of the class members would not need to be mooted or destroyed because subsequent events or the proof at trial had undermined the named plaintiffs' individual claims.

4. In both those cases, while refusing to allow individual plaintiffs determined not to have been discriminated against to represent the class, nevertheless, it having been previously certified, we did not dismiss, but rather ordered that the cases be kept alive on the district court docket for a reasonable time to allow a proper representative to come forward and intervene.

5. The *Rodriguez* opinion contains no hint of disapproval of across-the-board Title VII challenges. That consideration underscores the inevitable conclusion that the Court was speaking solely to a situation in which timely steps to obtain class certification had *not* been taken and thereafter it was established in plenary trial that the named plaintiffs had suffered *no* injury.

ing to sue as a class representative it is essential that a plaintiff must be a part of that class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents." It was from *Schlesinger* that the Supreme Court in *Rodriguez* quoted in employing the phrase "possess the same interest and suffer the same injury." *Schlesinger*, sporting the exact same clothing as *Rodriguez*, was decided June 25, 1974. *Barnett* was decided on June 12, 1975, essentially one year later, yet perceived no meaning in the tag phrase in any way comparable to that subsequently asserted for it by the majority. *See also O'Shea v. Littleton*, 414 U.S. 488, 494–95, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974); *Sosna v. Iowa*, 419 U.S. 393, 403, 95 S.Ct. 553, 559, 42 L.Ed.2d 532 (1975); *Bailey v. Patterson*, 369 U.S. 31, 32–33, 82 S.Ct. 549, 550, 7 L.Ed.2d 512 (1962).

Second, it is of little use to treat phrases like "same interest" and "same injury" as abstractions. The real issue is what the terms mean in concrete circumstances. The phrases may be read either broadly or narrowly. Read utterly expansively the phrases would permit anyone who has ever suffered race discrimination to "represent" *any* other person who has ever suffered from racial bias at totally different times and places. As we noted disapprovingly in *Hill v. Western Electric, supra*, 596 F.2d at 101–02, when the requirement is so indiscriminately read "any member of any . . . class who suffers discrimination has the same interest as other members of the class who suffered discrimination in very different circumstances and by very different means. . . ." Clearly, so extremely expansive a reading should not be accorded.

By the same token, however, it is equally inappropriate to assign unduly narrow meanings to "the same interest" and "the same injury." Carried to that opposite extreme, the restrictive language would foreclose any and all class suits, for it is obvious that no two employees ever suffer identically the "same" injury, or are ever subjected to exactly the "same" set of management decisions.

In short, the golden mean of reasonableness applies. A recognizable and substantial common thread linking the complaints of two or more individuals establishes the sameness of interest and injury. In some circumstances it is possible to foresee a situation in which a single central authority imposes a pervasive, uniform discriminatory policy in force through many different divisions, even though located in several geographically separated places. The universality of the policy may make it the same whether viewed from the viewpoint of an employee seeking promotion or transfer or from the perspective of someone denied employment.

It is equally possible, so long as we deal in generalizations, however, to imagine a plant where centralized management is scrupulous in avoiding any semblance of discrimination. Still, in the interests of efficiency, substantial autonomy is granted to the supervisor of each of a number of departments. There may be discrimination present in one department, out of a total of twenty, or if there are two or three departments where discrimination flourishes, the conditions may be totally unrelated to one another.

Consequently, determination of the appropriate composition of a class and of who properly may represent it must be approached and dealt with on a case-by-case basis. That for one company the sources of claimed discrimination as to employees on the one hand, and applicants for hire on the other, turns out to be distinctly separate and unrelated does not justify a leap to the conclusion that the "sameness" requirement for class certification and representation can never be satisfied when non-promotes and non-hires are put forward as a single class.

Evidently, in some cases, recruitment may be a separately managed function from operations. In others the same supervisory employee or employees may control both. All of which suggests that the proper reading of *Hill v. Western Electric Co., supra*, 596 F.2d 99, is only that the necessary link to establish "sameness" was lack-

ing, on the particular facts of that case, insofar as existing employees, on the one hand, and non-hires, on the other, were concerned.[6] The case properly could not, and indeed it did not, undertake absolutely, in any and every case, to bar a class, with a single representative, made up in part of non-promotes and partly of non-hires. The facts of the case control, and here, with respect to Black & Decker, the commonality was such to make proper the certification of the broad-based class and the selection of Ms. Abron as an appropriate representative.

Should Title VII class suits ever come into general judicial disfavor, no doubt defendants will be quick to emphasize even trivial dissimilarities. By focusing on the slightest factual variations of, or the particular label attached to, each area of management decision, the majority's theory of "same interest, same injury" can be applied to reduce all employment discrimination classes into a class of one.[7] For example, few employers have a "single" promotion practice from which all employees discriminatorily denied promotions suffer in exactly the same way. The Title VII employer's "promotion practices" would typically be numerous and varied. In making promotion decisions, Black & Decker was shown to rely on (among other things) (1) subjective evaluations by supervisors, (2) word-of-

mouth notification of openings, (3) recommendations by division managers, (4) successful completion of the apprenticeship program, and (5) seniority in a department. Under the majority's theory of "injury," an employee charging discrimination in promotions because of subjective evaluations by supervisors could not represent a class consisting of those who have been injured because not notified by word-of-mouth of openings. Such an employee, in the majority's view, would not have been "injured" by the word-of-mouth practice.

Similarly, under the majority's interpretation of "injury," a black employee discriminatorily rejected for assignment to the finance department could not represent the assignment claims of employees refused positions in the cafeteria, for different qualifications are required for and different management considerations govern appointment to the two departments.[8] Thus, a rejected finance employee-assignee would not have been "injured" by discriminatory assignment practices in the cafeteria. Ms. Abron, a grass shear packer would, under the majority's theory, find herself eligible to represent only other grass shear packers seeking temporary transfers. Parallel expressions of the majority's unique conception of discrimination injury undoubtedly will be elucidated in the context of recruit-

6. "The interest of *these* named, employed plaintiffs in being free of discrimination in job assignments and in promotions is so different in kind from that of people who were denied any employment that the named plaintiffs may not properly maintain an action for redress of alleged discrimination in hiring." *Hill v. Western Electric Co., supra*, 596 F.2d at 102 (emphasis supplied).

7. However, acceptance of this line of reasoning would mean that no cases alleging discrimination in hirings or promotions could be maintained as class actions. It is manifest that every decision to hire, fire, or discharge an employee may involve individual considerations. Yet when that decision is made as part of class-wide discriminatory practices, courts bear a special responsibility to vindicate the policies of the Act regardless of the position of the individual plaintiff.... Factual identity between the plaintiff's claims and those of the class he seeks to represent is not necessary.

*Senter v. General Motors Corp.*, 532 F.2d 511, 524 (6th Cir. 1976), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976). *See also Donaldson v. Pillsbury Co.*, 554 F.2d 825, 830–31 (8th Cir. 1977), *cert. denied*, 434 U.S. 856, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977).

8. Such a position was wrongly taken by the district court in *Rich v. Martin Marietta Corp.*, 522 F.2d 333, 340–41 (10th Cir. 1975). The circuit court reversed the lower court's refusal to certify a class in which the representatives challenged promotional practices in different departments throughout the plant. *But cf. Hill v. Western Electric, supra*, 596 F.2d at 102–03 (skilled installers and unskilled service center workers, though living in the same geographic area, are not a common class since they are not drawn from the same labor market, do not work in the same facility, and have different training and experience requirements).

ment, discipline, discharge and other employment practices, by clever defendants bent on confining the permissible scope of representation to identical departments within the same facility, to identical positions aspired to, to particular practices complained of, and, finally, to factual circumstances of the individual employee. The shrewd defendant would attempt to confine Ms. Abron's permissible representation to the injured "class" of all blacks employed in July 1972 in Ms. Abron's department who, suffering from health problems, were denied temporary transfers.

Moreover, under the majority's analysis, the particular label attached to the underlying practice becomes paramount. Thus, Ms. Abron, presenting a claim of denial of *temporary* transfer, is said to suffer harm so unlike employees denied *permanent* transfer as to render her ineligible under any circumstances to represent a challenge to discriminatory permanent transfer policies. Yet it is readily apparent that there is no difference significant enough to undermine Abron's capacity to represent claims involving permanent transfers. Moreover, an employer whose *promotion* practices discriminate against minorities may very well also for the *same* reasons pursue a policy of discriminatory *assignments*, and we would be derelict if we did not understand that the policies might well be shown to have stemmed from the same animus.[9] All employees and applicants face the present or future danger that an employer's generalized discriminatory practices will affect them. The class suit is, of course, designed to achieve a common redress of individual grievances. But, practically, only a few of those wronged will recover if each must file a separate suit. The class action, and the right to act in a representative capacity for the class, should be interpreted in a highly remedial fashion.

Furthermore, the overreliance upon labeling which I submit is a fault of the majority opinion altogether fails to acknowledge that, except for a challenge to an employer's practices, involving its lowest level entry position, *hiring* claims involving a particular position are virtually identical to *promotion* (or transfer) claims involving the same position. Neither the marking of a transfer as "permanent" or "temporary," nor the labeling of the act of filling a vacancy as "hiring," "promotion," or "transfer" detracts from the similarity of the claims or the adequacy of the representative to represent the class members' claims.

The foregoing examples illustrate that nothing is resolved by relying on the words "same interest" and "same injury" to *solve* the problem. Rather the use of the words properly is only to *describe* the solution after it has been reached by application of the appropriate principles. As Oliver Wendell Holmes averred many years ago, empty generalizations do not resolve particular cases. *See Lochner v. New York*, 198 U.S. 45, 76, 25 S.Ct. 539, 547, 49 L.Ed. 937 (1905) (Holmes, J., dissenting). Whether conceived expansively or restrictively, the substantive definition of "interest" and "injury" cannot be made to depend upon formalistic labels such as those imposed by today's decision. Rather, as we recently recognized in *Stastny v. Southern Bell Tel. & Tel. Co.*, 628 F.2d 267, 272–80 (4th Cir. 1980), resolving the question of the proper scope of representation in Title VII suits depends entirely upon substantive considerations that abstractions such as "same interest/same injury" cannot supplant. Given that we must make a principled decision regarding the proper scope of class representation in discrimination suits, we should draw upon three separate sources of authority: (1) judicial precedents concerning Rule 23; (2) Supreme Court decisions concerning

---

**9.** The assumption that separate instances of race discrimination are unrelated to systematic employment policies or practices is unwarranted. Often, separate challenges to an employer's promotion and transfer policy could be closely related. For example, a denial of a transfer to another department of a firm may in

fact amount to a denial of a promotion. *See, e. g., Russell v. American Tobacco Co., supra*, 528 F.2d at 362 (4th Cir. 1975) ("discriminatory hiring in departments of a business may be remedied by requiring the company to allow transfers between departments").

the nature of employment discrimination injury; and (3) Congressional statements concerning broad representation in Title VII class action suits.

### C.

In the majority's view, Ms. Abron was injured because she was denied a temporary transfer. But the source of discriminatory treatment of people like Ms. Abron lay not exclusively, or even principally, in the mistreatment of blacks suffering health problems who were denied temporary transfers in July 1972. Rather, the specific instance of discrimination reported by Ms. Abron is simply a single manifestation of racially discriminatory plant-wide employment practices that infused the working environment of all its employees. Ms. Abron's total injury is confined by the majority to the particular set of facts surrounding Black & Decker's failure to transfer her. Yet her injury was not merely that Black & Decker failed to provide her exactly the equal treatment she sought, but that the much wider ranging *reason* for the denial of transfer was racially discriminatory, and had a broader impact than simply the denial of a temporary transfer. Without the racially discriminatory denial—far broader in scope than the particularized mistreatment of Ms. Abron—she would have had no Title VII claim. Her *interest* is in being treated in all her employment's facets as an individual regardless of her race. Her *injury* was being subjected to a racially discriminatory employment environment and a set of employment practices which culminated in the denial of a temporary transfer. Thus, when Abron's "interest" and "injury" are viewed, as they must, against the substantive legal background of Title VII, *see Stastny, supra,* 628 F.2d at 274–76, she "possess[es] the same interest [nondiscriminatory treatment by a common employer] and suffer[s] the same injury" [racially dis-

criminatory employment environment] as the members of the class certified by the district court.

The fallacy of the majority's position is that, in identifying the "injury" suffered by an employee, it focuses upon the *factual* variations among discriminatees rather than upon the *legal* foundation upon which each individual's claim is based. However, "[w]hen the claim arises out of the same legal or remedial theory, the presence of factual variations is normally not sufficient to preclude class action treatment." *Donaldson v. Pillsbury Co., supra,* 554 F.2d at 831; *Gibson v. Local 40, Supercargoes and Checkers of the International Longshoremen's and Warehousemen's Union,* 543 F.2d 1259, 1264 (9th Cir. 1976) ("A class action may be maintained under Federal Rules of Civil Procedure 23(b)(2), alleging a general course of racial discrimination by an employer or union, though the discrimination may have been manifested in a variety of practices affecting different members of the class in different ways and at different times."); *Russell v. American Tobacco Co., supra,* 528 F.2d at 365. An interpretation of "same interest/same injury" that requires such a factual similarity between injuries suffered by a representative and injuries suffered by *each* class member cannot be what the Supreme Court meant in *Rodriguez.* That Fed.R.Civ.P. 23(c)(4) provides for subclassing surely serves as acknowledgment that not every class member occupies the *identical* factual posture or shares the *identical* interest in every litigated issue. Additionally, it is common practice in Title VII lawsuits that issues of liability (typically class claims) be severed from subsequent backpay or seniority remedies (typically individual claims). *See, e. g., Baxter v. Savannah Sugar Ref. Corp.,* 495 F.2d 437, 443–44 (5th Cir.), *cert. denied,* 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974).[10] Finally, Rule 23 does not require

---

**10.** A Title VII class action suit presents a bifurcated burden of proof problem. Initially, it is incumbent on the *class* to establish that an employer's employment practices have resulted in cognizable deprivations to it as a class. At that juncture of the litigation, it is unnecessarily complicating and cumbersome to compel any particular discriminatee to prove class coverage by showing personal monetary loss. What is necessary to establish liability is evidence that the *class* of black employees has suffered from the poli-

that all questions raised in the litigation be identical. There need be only a single issue common to all members of the class. Therefore, a defendant who acts "on grounds generally applicable to the class," Rule 23(b)(2), creates standing in a class representative, "even if" his actions "[have] taken effect or [are] threatened only as to one or a few members of the class." Advisory Committee Notes to 1966 Amendments to Fed.R.Civ.P. 23. In sum, there has never been a requirement that every issue in a Title VII class suit affect every member of a class in precisely the same way, nor that every issue affect the class representative and other class members in precisely the same way. Such a constraint undoubtedly would frustrate the goals of Title VII. *Vuyanich v. Republic Nat. Bank of Dallas,* 78 F.R.D. 352, 357 (N.D.Tex.1978).

Apart from its focus upon the factual dissimilarity existing between a named representative and various members of the class, the critical error of the majority position stems from its apparent belief that Ms. Abron cannot be injured by a discriminatory promotion (or hiring, assignment, etc.) practice unless she "filed [a] request for promotion and was denied it." (At 955). However, the test for Rule 23 standing to challenge promotion practices is not whether one has been *denied* a promotion, but whether one has been *harmed* by discriminatory promotion practices.

> The effects of and the injuries suffered from discriminatory employment practices are not always confined to those who were expressly denied a requested employment opportunity. A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection.

*International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 365, 97 S.Ct. 1843, 1869, 52 L.Ed.2d 396 (1977) (nonappli-

cants for positions may still share in the relief awarded). Although an employee may not have been denied a promotion, suffering *some* particularized grievance plus the perpetuation of a discriminatory employment environment coupled with the constant *threat* of being discriminatorily denied a promotion is the "injury," referred to in *Rodriguez,* that links the representative employee to other employees and applicants. Contrary to the majority's holding, it has never been required under Title VII that one be discriminatorily *assigned* in order to suffer the legally cognizable injury permitting one standing to challenge discriminatory *assignments.* It is enough to show legal injury (and consequently representative status on behalf of a group of employees and applicants for employment) by establishing that one has been personally denied *some* employment benefit, and either lives with a racially discriminatory employment *environment* or lives under the *threat* of a particular employment policy. As artfully put by Judge Gray in *Hall v. Werthan Bag Corp.,* 251 F.Supp. 184, 186 (M.D.Tenn.1966),

> Racial discrimination is by definition a class discrimination. If it exists, it applies throughout the class. This does not mean, however, that the effects of the discrimination will always be felt equally by all the members of the racial class. For example, if an employer's racially discriminatory preferences are merely one of several factors which enter into employment decisions, the unlawful preferences may or may not be controlling in regard to the hiring or promotion of a particular member of the racial class. But although the actual effects of a discriminatory policy may thus vary throughout the class, the existence of the discriminatory policy threatens the entire class. And whether the Damoclean threat of a racially discriminatory policy hangs over the racial class is a question of

cies and practices of the particular employer. Assuming that the class does establish invidious treatment, the court should then properly proceed to resolve whether a particular employee is in fact a member of the covered

class, has suffered financial loss, and thus entitled to back pay or other appropriate relief.
495 F.2d at 443–44 (emphasis in original).

fact common to all the members of the class.

See also Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 208–09, 93 S.Ct. 364, 366, 34 L.Ed.2d 415 (1972); Sosna v. Iowa, supra 419 U.S. at 413–14 n.1, 95 S.Ct. at 564 n.1 (White, J., dissenting).

In addition to judicial statements involving Rule 23, several Supreme Court opinions have carefully analyzed the nature of discrimination injury and concluded that "the loss of important benefits from interracial associations" is alone a sufficient injury to confer standing. In Trafficante, supra, 409 U.S. at 210, 93 S.Ct. at 367, two tenants, one black, one white, of an apartment complex contended that their landlord violated Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3610(a), by discriminating against nonwhites on the basis of race in the rental of apartments. The Court, holding that the tenants were "within the class of persons entitled to sue under the Act," stated that

> [W]e can give vitality to [Title VIII] only by a generous construction which gives standing to sue to all in the same housing unit who are injured by racial discrimination in the management of those facilities within the coverage of the statute.

409 U.S. at 208, 212, 93 S.Ct. at 369. See also Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 111–15, 99 S.Ct. 1601, 1614, 60 L.Ed.2d 66 (1979) (deprivation of benefits of interracial associations constitutes sufficient injury to accord plaintiffs standing); Rogers v. Paul, 382 U.S. 198, 200, 86 S.Ct. 358, 360, 15 L.Ed.2d 265 (1965) (permitting minority students to represent challenge to school policy allocating faculty on a racial basis). Thus, an employee (who has been hired) has standing under Trafficante and Gladstone to challenge discriminatory hiring policies.

Similarly, in Coles v. Havens Realty Corp., 633 F.2d 384, 388–90 (4th Cir. 1980), cert. granted, —— U.S. ——, 101 S.Ct. 1972, 68 L.Ed.2d 293 (1980), a class action suit, we held that "testers" challenging racially-discriminatory "steering" practices of the defendant realty companies were persons "aggrieved" as defined in the Fair Housing Act. There we recognized that the interest in "living in integrated communities free from discriminatory housing practices," 633 F.2d at 389, involved rights shared by all members of the class living in the community. As the successful tenants in Trafficante and the plaintiffs in Gladstone and Coles met constitutional standing requirements to litigate the denial of housing applicants on their own behalf, it follows that Sarah Abron has the prudential Rule 23 standing to represent a class challenging allegedly discriminatory hiring practices. It cannot be said that she concerns herself with this suit out of fevered altruism. Not only has the class been injured by the challenged practices, but so has she. She is entitled to work in an environment where, as the law requires, she is free from an aroma of discrimination. If the aroma arises from several distinct, separated sources, then the class may not properly be plant wide. In the present case, however, the proof established a single permeating, facility wide discrimination.

Numerous cases have held that an employee may bring a Title VII suit against an employer who creates or condones a discriminatory work environment, regardless of whether the complaining employees lost any tangible job benefits as a result of the discrimination. In Rogers v. Equal Employment Opportunity Comm'n, 454 F.2d 234 (5th Cir. 1971), cert. denied, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972), the plaintiff, an Hispanic employee, claimed that her employer, a firm of opticians, created a discriminatory work environment for its Hispanic employees by giving discriminatory service to its Hispanic patients. Judge Goldberg wrote:

> Time was when employment discrimination tended to be viewed as a series of isolated and distinguishable events, manifesting itself, for example, in an employer's practices of hiring, firing, and promoting. But today employment discrimination is a far more complex and pervasive phenomenon, as the nuances and subtleties of discriminatory employment

practices are no longer confined to bread and butter issues. As wages and hours of employment take subordinate roles in management-labor relationships, the modern employee makes ever-increasing demands in the nature of intangible fringe benefits. Recognizing the importance of these benefits, we should neither ignore their need for protection, nor blind ourselves to their potential misuse.

454 F.2d at 238. *See also Waters v. Heublein, Inc.*, 547 F.2d 466 (9th Cir. 1976), *cert. denied*, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1100 (1977) (white plaintiff has standing under Title VII to sue employer who discriminates against minorities, since she has statutory right to a work environment free of racial prejudice); *Swint v. Pullman-Standard*, 539 F.2d 77 (5th Cir. 1976) (discriminatory job assignments violate Title VII even where no discrimination in salary; Title VII claimant need not prove tangible economic harm); *Firefighters Institute for Racial Equality v. City of St. Louis*, 549 F.2d 506, 514–15 (8th Cir. 1977), *cert. denied*, 434 U.S. 819, 98 S.Ct. 60, 54 L.Ed.2d 76 (1977) (segregated employee eating clubs—though not organized or regulated—when condoned by employer violate Title VII by creating discriminatory work environment); *Gray v. Greyhound Lines, East*, 545 F.2d 169, 176 (D.C.Cir.1976) (black employee may challenge discriminatory hiring policies on grounds that the policies violate Title VII rights to nondiscriminatory work environment); *United States v. City of Buffalo*, 457 F.Supp. 612, 631–635 (W.D.N.Y.1978) (black employees entitled to work environment free of racial abuse and insult). And the EEOC, whose interpretation of Title VII is entitled to great weight, *Griggs v. Duke Power Co.*, 401 U.S. 424, 433–34, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971), has consistently held that the statute grants an employee the right to "a working environment free of racial intimidation." EEOC Decision No. 74–84, CCH EEOC Decisions ¶ 6450 (1975). *Cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804–05, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973) (a finding of racial discrimination against some employees supports an inference of discrimination against similarly situated employees). While a named plaintiff who has not been denied tangible job benefits as a result of some of the employment practices she challenges may not be entitled to monetary relief, she may still be entitled to an injunctive remedy for the denial of a work environment free of racial discrimination.

Moreover, allowing plaintiffs broad Rule 23 standing to represent across-the-board challenges to an employer's allegedly discriminatory employment practices when the attack is on the basis that the practices are themselves across-the-board has been sustained on the theory that the named plaintiff is a "private attorney general" vindicating interests that are not solely his own. *EEOC v. Associated Dry Goods Corp.*, 449 U.S. 590, 602, 101 S.Ct. 817, 824, 66 L.Ed.2d 762 (1981) ("Congress considered the [Title VII] charging party a 'private attorney general' whose role in enforcing the ban on discrimination is parallel to that of the Commission['s]"). *See Deposit Guaranty National Bank v. Roper*, 445 U.S. 326, 338–39, 100 S.Ct. 1166, 1173, 63 L.Ed.2d 427 (1980); *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 499 (5th Cir. 1968) (A Title VII plaintiff who obtains an injunction "does so not for himself alone, but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest priority"), *quoting Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968).

Such definition of the "injury" governing the proper scope of the class is consistent not only with the purposes of Rule 23, and with the substantive understanding of discrimination injury, but also with the history and purposes of Title VII of the Civil Rights Act. Congress recognized that the relationship between specific instances of discrimination and discriminatory employment practices called for broad remedial suits challenging the source of the bias. Regarding EEOC enforcement authority, the House Committee reporting on the 1972 amendments stated:

Pattern or practice discrimination is a pervasive and deeply embedded form of discrimination. Specific acts or incidents of discrimination [within the Commission's jurisdiction] are frequently symptomatic of a pattern or practice which Title VII seeks to eradicate.... Unrelenting broad-scale action against patterns or practices of discrimination is ... critical in combatting employment discrimination.

H.Rep.No.238, 92d Cong. 1st Sess. 14 (1971), *reprinted in* Senate Comm. on Labor and Public Welfare, 92d Cong., 2d Sess., *Legislative Hist. of the Equal Empl. Opp. Act of 1972*, at 74 (1972) (*"Legislative History"*).

Congress also declared that broad class actions were indispensable in freeing workplaces of racial bias. When Title VII was amended in 1972, the House version of the bill prohibited class action lawsuits. However, spearheading Congress' rejection of the House version, the Senate Committee stated:

This section [authorizing the filing of discrimination suits] is not intended in any way to restrict the filing of class complaints. The committee agrees with the courts that title VII actions are by their very nature class complain[t]s, and that *any restriction on such actions would greatly undermine the effectiveness of title VII.*

S.Rep.No.415, 92d Cong., 1st Sess. 27 (1971) (emphasis added), *reprinted in "Legislative History"* at 436. And the Conference Committee, specifically refusing to adopt the House proposal limiting class actions, reasoned that

claims under Title VII involve the vindication of a major public interest, and that any action under the Act involves considerations beyond those raised by the individual claimant.

Conf. Rep. (Senate) No. 92–681, *reprinted in Legislative History* at 1847. Congress enacted the bill as reported by the Conference Committee. 118 Cong.Rec. 7168, 7170, 7573 (1972). In the face of such explicit congressional endorsement of the role and importance of class actions in combatting employ-

ment discrimination, we should not adopt a procedural limitation which would destroy the utility of the class action as a device to effectuate Title VII's "broad remedial purposes." *See, e. g., International Brotherhood of Teamsters v. United States, supra*, 431 U.S. at 348–49, 97 S.Ct. at 1861; *Falcon v. General Tel. Co. of the Southwest*, 626 F.2d 369, 375 (5th Cir. 1980), *vacated and remanded on other grounds*, —— U.S. ——, 101 S.Ct. 1752, 68 L.Ed.2d 234 (1981).

## D.

In light of the substantial body of civil rights law concerning racial injury, it is clear that *Rodriguez* did not propose or authorize either a substantive cutback in the remedies available to Title VII plaintiffs nor propose to limit the availability of an across-the-board action to them. *See Satterwhite v. City of Greenville*, 578 F.2d 987, 993 n.8 (5th Cir. 1978) (*en banc*) ("Nor is *Rodriguez* or this opinion contrary to the policy favoring 'across the board' Title VII class actions.... It is not necessary that the representative suffer discrimination in the same way as other class members, but it is necessary that she suffer from the discrimination in some respect."), *vacated and remanded on other grounds*, 445 U.S. 940, 100 S.Ct. 1334, 63 L.Ed.2d 773 (1980), *on remand*, 634 F.2d 231 (5th Cir. 1981) (*en banc*). On the contrary, while ruling that Title VII plaintiffs must do more than merely *allege* discrimination in order to demonstrate their adequacy as representatives, the Court carefully acknowledged the customary class nature of Title VII claims.

We are not unaware that suits alleging racial or ethnic discrimination are often by their very nature class suits, involving classwide wrongs. Common questions of law or fact are typically present.... [But] [t]he mere fact that a complaint alleges racial or ethnic discrimination does not *in itself* ensure that the party who has brought the lawsuit will be an adequate representative of those who may have been the real victims of that discrimination.

*Rodriguez, supra,* 431 U.S. at 405–06, 97 S.Ct. at 1897 (emphasis added). Accordingly, lower courts were directed to pay "careful attention" to the requirements of Rule 23. *Rodriguez* was such a case, holding that *procedurally,* where the plaintiffs neglected to seek class certification and went to trial solely on their individual claims, the decision on the merits that the plaintiffs had suffered no discrimination barred them from representing *anyone* else, irrespective of the degree of similarity or sameness of the claims. The case said nothing about what would constitute sameness or how it should be determined. The Courts of Appeal, including this circuit, have before and since *Rodriguez* consistently authorized employee class representatives to represent other employees, and often applicants for employment, in challenging discriminatory employment practices.

Subsequent to *Rodriguez,* we decided *Hill v. Western Electric, supra,* 596 F.2d 99.[11] Contrary to the majority's conclusion, *Hill* does not foreclose an employee from mounting a class attack on all in-plant employment practices. In that case we found reason to limit the capacity of an employee, who was hired, to represent a class that included persons who were denied employment altogether. 596 F.2d at 101. However, *Hill* acknowledged the law settled since *Barnett*: an employee-discriminatee may represent other employee-discriminatees in a plant-wide challenge to discriminatory policies. In the words of *Hill,*

> [t]he interest of these named, *employed* plaintiffs in being free of discrimination in job assignments and in promotions is so different in kind from that of people who were *denied any employment* that the named plaintiffs may not properly maintain an action for redress of alleged discrimination in *hiring*. . . . [But,] *Ro-

*driquez* (sic) did not require the fractionalization of similar claims by a *class of employees* in a single facility, nor does it destroy the utility of the class action device by requiring *separate suits* on an episodic basis.

596 F.2d at 102 (emphasis added). Thus, at the very least, *Hill* leaves intact the *Barnett* ruling that an *employee* who claims prejudice as a result of a particular practice of his employer has Rule 23 standing to represent other *employees* suffering discrimination. From their common employment and shared racial interests, they share a "community of interests." 596 F.2d at 102. Of course, the other requirements (numerosity and commonality, e. g.) of Rule 23(a) also have to be met, but under *Hill,* the Rule 23 *standing* requirement is satisfied if all class members are employees. In short, *Hill* permits an employee who suffers in-plant racial bias to represent other employees in a challenge to employment practices that affect employees. *See Scott v. University of Delaware,* 601 F.2d 76, 87 n.23 (3d Cir. 1979), *cert. denied,* 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979) (citing *Hill* for the proposition that "[s]everal courts have held that a named plaintiff who challenges a defendant's discriminatory *promotion* practices may not represent a class contesting the defendant's *hiring* practices because these claims are insufficiently similar") (emphasis in original). Therefore, *Hill* presents no support for the proposition that Ms. Abron was not a proper class representative of other employees challenging discriminatory classification, assignment, promotion, transfer, apprenticeship training, and compensation, terms and conditions and privileges of employment. Indeed it suggests the contrary.

Second, *Hill* erects no *per se* barrier to employee representation of applicants who

11. The majority also cites our decisions in *Shelton v. Pargo, Inc.,* 582 F.2d 1298, 1313 n.53 (4th Cir. 1978) and *Belcher v. Bassett Furniture Industries, Inc.,* 588 F.2d 904 (4th Cir. 1978) in support of its ruling. Neither case, however, involved the proper scope of class representation. "The issue presented for appeal" in *Belcher* involved the propriety of a district court order "granting a motion for discovery pursuant to Rule 34 of the Fed.R.Civ.P." 588 F.2d at 906. We made clear that "our statements are not to be taken as either approving or disapproving the class certification of the case." *Id. Pargo,* on the other hand, dealt with whether precertification notice must be given absent class members prior to district court approval of a proposed settlement of individual claims.

were not hired or to an employee challenge to recruitment and hiring policies. *Hill* held that the mere fact that plaintiffs are members of the same race as the other employees and rejected job applicants whom they sought to represent in a class action was not enough *in and of itself* to permit a finding under Rule 23 that their representation was adequate or that their claims were typical of the class.

Indeed, as our more recent decision in *Stastny v. Southern Bell Tel. & Tel. Co., supra,* 628 F.2d 267, confirms, formalistic generalized rules precluding class representation of applicants by an employee have given way in this circuit to a requirement that each class certification decision be approached on a case-by-case basis. Where an employee has personally been subjected to a particularized discriminatory employment practice, and labored within a segregated or discriminatory work environment, he or she may under our decisions represent a challenge to hiring and recruitment policies.

In sum, Abron had herself been subject to the defendant's employment policies regarding job classification, assignment, promotion, transfer, benefits, apprenticeship training programs, compensation, terms, conditions and privileges of employment. Therefore, she had standing under *Hill* to represent her fellow employees' common challenge to those policies. *Hill* holds nothing to the contrary, being concerned only with representation by an employee of non-employees, those suffering discrimination in hiring and recruitment.

Against a contention that *Hill* may be read to erect a *per se* barrier to Abron's representation of an applicant class, I submit that *Hill* is not good law.[12] Recent Supreme Court class action decisions reinforce me in my conclusion that no circuit authority as represented by *Hill* or Supreme Court authority under *Rodriguez* stands in the way of affirming the district court's class certification.

In *Deposit Guaranty National Bank v. Roper,* 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980), and *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980), the Supreme Court held that a person whose claim on the merits had expired nevertheless retained a sufficient personal stake in the outcome to be accorded the right to appeal a denial of class certification. In *Geraghty,* the plaintiff, a federal prisoner challenging parole release guidelines, sought to represent all federal prisoners subject to those guidelines. The Court held that he was a proper representative to press the class claims on appeal, despite both the district court's rejection of the challenge on the merits and the fact that he had been released from prison and thus was no longer affected by the guidelines. Significantly, the Court also held that the expiration of Geraghty's claim did not, in itself, preclude him from representing the class upon remand. "Upon remand, the District Court can determine whether Geraghty may continue to press the class claims or whether another representative would be appropriate." 445 U.S. at 407, 100 S.Ct. at 1214. However, while not deciding whether Geraghty would be a proper representative, the Court's holding shifted "the focus of examination from the elements of justiciability to the ability of the named representative to 'fairly and adequately protect the interests of the class.' " 445 U.S. at 406, 100 S.Ct. at 1214 (*quoting Sosna v. Iowa, supra,* 419 U.S. at 419, 95 S.Ct. at 567). In short, *Geraghty* holds that a plaintiff who is not personally affected by challenged practices is not preemptively foreclosed from representing the class. Applying *Geraghty* to the case at hand, even were we to assume for purposes of argument that Abron was not personally aggrieved by unlawful promotion practices, *Geraghty* holds that that fact is not alone sufficient to foreclose her representation of

---

12. To the extent that arguably that is a holding of *Hill*, I am, of course, bound by circuit precedential authority, and to that extent I would concur, rather than dissent, though obviously with diminished enthusiasm. However, for the reasons I have given I do not so read *Hill*, respectfully submit that the majority has misapplied *Hill*, and suggest that the position adopted in my dissent is fully compatible with *Hill*, correctly applied.

a class composed of black persons that Black & Decker failed to promote. Instead, the focus shifts to whether she would fairly protect the interests of the class.

Conceivably, *Geraghty* might be distinguished on the basis that the plaintiff there once had a claim "similar" to that of a class, while here, *arguendo*, Abron never possessed such a claim. However, the crucial fact is that even if neither Abron (for sake of argument) nor the *Geraghty* plaintiff has anything concrete to gain by a favorable class determination on the merits, still she or he may possess sufficient interest to act as a class representative. As stated by the Third Circuit, "we can perceive no reasoned distinction between the personal stake of a person whose claim is mooted and one whose claim is without substantive merit." *Alexander v. Gino's, Inc.*, 621 F.2d 71, 73 (3d Cir. 1980), *cert. denied*, 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980).

The Supreme Court's recent decision in *Satterwhite v. City of Greenville*, 445 U.S. 940, 100 S.Ct. 1334, 63 L.Ed.2d 773 (1980), *vacating and remanding* 578 F.2d 987 (5th Cir. 1978) (*en banc*), *on remand*, 634 F.2d 231 (5th Cir. 1981) (*en banc*), confirms that conclusion. In *Satterwhite* the named plaintiff, a woman denied a position as Greenville's airport manager, brought a sex discrimination class suit on behalf of herself and applicants and employees of the city. The district court denied certification and proceeded to find that her individual claim was without merit. Affirming, the Fifth Circuit, sitting *en banc*, determined that since "Mrs. Satterwhite has never suffered any legally cognizable injury either in common with the class or otherwise," under *Rodriguez* she was not a proper representative of a class whose members did suffer injury. 578 F.2d at 992. The Supreme Court reversed and remanded for reconsid-

eration in light of *Geraghty* and *Roper*. On remand, the Fifth Circuit interpreted the Supreme Court mandate to require it to return the case to the district court in order to determine whether the "action is a proper class action" and whether "Mrs. Satterwhite is an appropriate class representative." 634 F.2d at 231.

Despite the majority's suggestion, *no other circuit* court has reached the result proposed in the instant case. Indeed, nearly every circuit has embraced the concept of across-the-board class certification. *Gray v. Greyhound Lines, East, supra*, 545 F.2d at 176 (D.C.Cir.1976); *Lamphere v. Brown University*, 553 F.2d 714, 719 (1st Cir. 1977); *Norwalk CORE v. Norwalk Redevelopment Agency*, 395 F.2d 920 (2d Cir. 1968); *Vulcan Society of Westchester County v. Fire Dept. of White Plains*, 82 F.R.D. 379 (S.D.N.Y. 1979); *Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239 (3d Cir. 1975), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *Hackett v. McGuire Bros., Inc.*, 445 F.2d 442 (3d Cir. 1971); *Payne v. Travenol Laboratories, Inc.*, 565 F.2d 895, 900 (5th Cir. 1978), *cert. denied*, 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978); *Alexander v. Aero Lodge No. 735*, 565 F.2d 1364, 1372–73 (6th Cir. 1977), *cert. denied*, 436 U.S. 946, 98 S.Ct. 2849, 56 L.Ed.2d 787 (1978); *Senter v. General Motors Corp., supra*, 532 F.2d 511 (6th Cir. 1976); *Crockett v. Green*, 534 F.2d 715 (7th Cir. 1976); *Alliance to End Repression v. Rochford*, 565 F.2d 975, 979 (7th Cir. 1977) (although the class complained of a variety of practices and alleged a variety of constitutional violations, "the existence of an unconstitutional pattern and practice of intelligence gathering . . . fostered by the existence of a conspiracy among various federal and state agencies, . . . creates the common question of law or fact sufficient to satisfy Rule 23");[13] *Donaldson v. Pills-*

---

**13.** *Patterson v. General Motors Corp.*, 631 F.2d 476 (7th Cir. 1980), illustrates the case-by-case approach the Seventh Circuit has adopted. There, the complaint alleged facts that "relate[d] solely to plaintiff's personal grievances." 631 F.2d at 480. According to the *Patterson* district court, "[u]nlike the typical Title VII class action case, this is not a case challenging a general employment policy such as testing, seniority rules, weight lifting restrictions, pregnancy policies or other policies of general application which clearly relate to a class of numerous similarly situated employees." *Id.* Affirming the denial of class certification, the appeals court held that where a plaintiff "has simply asserted *no* facts relating

bury Co., supra, 554 F.2d 825 (8th Cir. 1977); United States Fidelity & Guar. Co. v. Lord, 585 F.2d 860 (8th Cir. 1978), cert. denied, 440 U.S. 913, 99 S.Ct. 1228, 59 L.Ed.2d 462 (1979); Gay v. Waiters' and Dairy Lunchmen's Union, 549 F.2d 1330 (9th Cir. 1977); Gibson v. Local 40, Supercargoes and Checkers, ILWU, supra, 543 F.2d at 1264; Rich v. Martin Marietta Corp., 522 F.2d 333 (10th Cir. 1975).

The majority cites DeGrace v. Rumsfield, 614 F.2d 796 (1st Cir. 1980), Scott v. University of Delaware, supra, 601 F.2d 76, and Johnson v. American Credit Co. of Georgia, 581 F.2d 526, 532 (5th Cir. 1978), as "decisions reaching the same result" as the instant case. Contrary to the majority's implication, however, the law in the first, third and fifth circuits is precisely the opposite to that reached by the majority here. In Falcon v. General Tel. Co. of Southwest, supra, 626 F.2d at 374–76 (permitting an employee who individually charged failure to promote to represent job applicants denied employment), the Fifth Circuit stated:

> It is therefore apparent that this Court permits an employee complaining of one employment practice to represent another complaining of another practice, if the plaintiff and the members of the class suffer from essentially the same injury. . . . It is consistent with the holding in Rodriguez (sic) and the policy of Title VII to allow a plaintiff to represent a class suffering from a common discriminatory complaint [such as 'national origin']. While similarities of sex, race or national origin claims are not dispositive in favor of finding that the prerequisites of Rule 23 have been met, they are an extremely important factor in the determination, that can outweigh the fact that the members of the plaintiff class may be complaining about somewhat different specific discriminatory practices. . . .

to other members of the purported class," the district court's denial of class certification was not an abuse of discretion. Id. at 481 (emphasis in original).

Ms. Abron, of course, asserted and proved facts relating to other members of the class.

See also Satterwhite v. City of Greenville, supra, 578 F.2d at 993 n.8; Payne v. Travenol Laboratories, Inc., supra, 565 F.2d at 900 ("Plaintiffs' action is an 'across the board' attack on unequal employment practices alleged to have been committed by Travenol pursuant to a policy of racial discrimination. As parties who have allegedly been aggrieved by some of those discriminatory practices, plaintiffs have demonstrated a sufficient nexus to enable them to represent other class members suffering from different practices motivated by the same policies."). Johnson, supra, 581 F.2d 526, involving an action challenging Georgia's prejudgment attachment scheme, is simply inapposite to Title VII class suits, as the above decisions demonstrate.

The class action standing rule in the Third Circuit also permits an employee to represent prospective employees, as well as other workers. See, e. g., Wetzel v. Liberty Mutual Ins. Co., supra, 508 F.2d 239. Scott v. University of Delaware, supra, 601 F.2d 76, did not alter this position. Scott, rather, held that because the interests of the sole named employee representative, a faculty member,

> were necessarily in conflict with those [interests] of applicants for positions on the University faculty. . . . The assertion of these inconsistent positions necessarily forecloses any contention that Scott's claims are typical of the claims of those applying for faculty positions. Under these circumstances, it cannot be said that Scott was an adequate representative of the unnamed members of a class seeking employment.

601 F.2d at 86. Thus, while Scott did not allow an employee to represent a class of applicants, it did so because the named representative had a conflict of interest, not because he suffered for want of 23(a) standing.[14]

14. See also Scott, supra, 601 F.2d at 85 n.19 ("we agree that '[t]he conflict between the permissive and the rigorous approaches to the Rule 23(a) prerequisites was not settled by the Supreme Court's treatment of 23(a) in Rodriguez.' "); 601 F.2d at 93 (Adams, J., concurring) ("We do not hold that the class represent-

And in *DeGrace v. Rumsfield, supra,* 614 F.2d at 811 n.16, the First Circuit placed great emphasis upon its determination that the district court had not abused its discretion in decertifying a class once the plaintiff had been found not to have been a proper representative. If the same course were followed here, we would affirm the district court's decision.[15] In addition, *DeGrace* recognized

> that an "across the board" attack on discriminatory employment practices has been permitted with a discharged employee representing embracive classes. . . . We do not now decide under what circumstances such an approach is permissible; we only conclude that when the claims of the named representatives are predominantly individualized and the establishment thereof has little potential for bringing into question any discrete, "across the board" employment practice, the district court does not abuse its discretion in denying class certification.

614 F.2d at 811 n.16 (citations omitted). Thus, at the very least, it is clear that the First Circuit has not erected a *per se* barrier to across-the-board Title VII actions. What remains unclear is the degree to which, if any, *DeGrace* has withdrawn from its early confirmation of broad Rule 23 standing in Title VII litigation. *See, e.g.,*

*Lamphere v. Brown University, supra,* 553 F.2d at 719.

### E.

If the only effect of the majority's fragmentary approach to employment discrimination claims was the inefficiency created by multiplying the number of lawsuits filed and increasing duplication of time and effort involved in litigating them, I might object less strenuously to cutting back our traditional support for broad representative standing. However, there is more than that at stake here. The overtechnical limitation on representative status will drain the life out of Title VII. *See Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122, 1126 (5th Cir. 1969) (Godbold, J., concurring). Plaintiffs representing fragments of the original class are, after today, bound to find it more difficult to meet the numerosity requirement of Rule 23(a)(1). *See, e. g., Rich v. Martin Marietta Corp., supra,* 522 F.2d at 340–41 (reversing district court denial of certification because numerosity requirement not met where lower court narrowed the class to plaintiff's own department); *Barnett v. W. T. Grant & Co., supra,* 518 F.2d at 547 (lower court reversed where it denied certification due to want of numerosity but where class had erroneously been confined to employees). We have held that as many as 53 persons are not too

ative must stand in an identical position vis-à-vis his employer as the other class members, or that in general a person allegedly discriminated against with respect to promotion may not represent a class including individuals who were aggrieved by the employer's hiring practices"). In any event, in a Black & Decker factory where employment is fluid, reflecting and controlled by increases in sales, the situation is markedly different from the university setting where faculty size is generally static with most institutions at maximum student enrollments.

15. I note an additional feature presented by *DeGrace.* Although not mentioned by that court as a factor in its decision, the *DeGrace* court faced a situation in which the plaintiff's class had early been decertified, and the trial on his individual claims resulted in a finding of no liability. Thus, if *DeGrace* had reversed the lower court decertification decision, it would have authorized a representative who had no stake in the outcome. When reviewing certification orders, appellate courts theoretically ex-

amine facts in existence at the time of certification. However, we cannot help but be influenced by subsequent events, such as the considered determination after trial that the putative representative was not a member of the class of discriminatees. Indeed, in footnote 12, *Rodriguez* seems to compel the *DeGrace* court's conclusion that a plaintiff who loses his individual claim at trial may not be a proper class representative under Rule 23: "[w]here no class has been certified, . . . and the class claims remain to be tried, the decision whether the named plaintiffs should represent a class is appropriately made on the full record, including the facts developed at the trial of the plaintiffs' individual claims." 431 U.S. at 406 n.12, 97 S.Ct. at 1898 n.12. If the *DeGrace* court had considered the possibility of remanding to the district court for a reasonable time to afford an appropriate representative opportunity to step forward, perhaps it would have reached a different conclusion. *See* part III, *infra.*

"numerous" to make joinder and proceeding on an individual, rather than a class, basis impracticable. *Roman v. ESB, Inc.*, 550 F.2d 1343, 1349 (4th Cir. 1976) (*en banc*) (district court defined the class narrowly, then denied certification for want of numerosity). However, in a case such as the one at hand in which a major regional employer employs barely a hundred members of a minority group, splintering the minority employee class as proposed by the majority would effectively deny, for want of a sufficiently large number of minority employees, class treatment for the most egregious discriminatory hiring policies. In one sense, therefore, the majority's decision encourages a firm like Black & Decker to maintain a workforce composed of fewer than 3% minority out of an SMSA composed of 22% qualified black labor force members. Under the current decision, there is a danger that *no* minority employee of Black & Decker may be able to satisfy all the requirements of Rule 23(a), particularly numerosity. Therefore, its discriminatory practices may go unchallenged.

Moreover, the deterrent effect of across-the-board class actions challenging systemic discrimination, *see Parham v. Southwestern Bell Tel. Co., supra*, 433 F.2d at 428, cannot be matched by even a series of single-plaintiff actions or single-issue class actions. Without the backing of a comprehensive class, individual plaintiffs or their lawyers will find it difficult to muster the resources and incentives sufficient to tackle industrial giants such as Black & Decker. We will observe classic applications of the strategy of divide and conquer.

More significantly, perhaps, today's decision will mean that fewer plaintiffs suffering real employment discrimination will receive redress. Courts have recognized that class suits provide a forum for the small claimant and the uninformed, *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 551–52, 94 S.Ct. 756, 765, 38 L.Ed.2d 713 (1974); *Samuel v. University of Pittsburgh*, 538 F.2d 991, 997 (3d Cir. 1976), protect the rights of those reluctant or unable to file individual actions against defendants for fear of jeopardizing continuing necessary relationships, *Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1164–65 (7th Cir. 1974); *Ste. Marie v. Eastern RR. Ass'n*, 72 F.R.D. 443, 449 (S.D.N.Y.1976), and provide a means for aggrieved persons to obtain redress "[w]here it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages." *Roper, supra*, 445 U.S. at 339, 100 S.Ct. at 1173. Erecting today's unnecessary and uncalled for procedural barrier to representative standing can only frustrate the substantive objectives underlying Title VII class suits.

I emphasize again that the single issue before us today is the permissible scope of Rule 23 standing requirements. A Title VII plaintiff faces several hurdles before certification—Rule 23 standing is just one. We should be loath to build into the concept of *standing* such extreme limitations on the appropriate issues which a representative may litigate. Nevertheless, sensitivity on that point does not mean that representatives will thereby escape any restrictions on their ability to define a class. On the contrary, before certification, Title VII class representatives would still be required to meet the Rule 23(a) and (b) requirements. The difference between my view and that of the majority is essentially that the majority holds that a representative *never* has standing to litigate issues on behalf of a class of employees whose complaints, while stemming from a common pattern or practice, differ in exact detail from the complaint of the representative, while I would permit such suits provided the plaintiff met the commonality, typicality, numerosity, etc. requirements of Rule 23.

That plaintiffs have Rule 23 *standing* to represent broad classes in Title VII cases does not mean that they will always seek to represent broad classes or that broad classes will be certified. Generally speaking, the broader the class definition, the more difficult will it be for named plaintiffs to meet the commonality, typicality and adequacy requirements. My point is simply that the Rule 23 standing concept is not the proper vehicle to limit the definition of a Title VII class.

**974**

### III.

Even assuming that the majority is correct on Abron's standing to represent the class, there is still a further reason why the disposition ordered—dismissal of the class claims—is inappropriate. The position adopted by the majority only disqualified Abron as an appropriate class representative. It in no way suggested that the class claims, substantiated in full-scale trial, were lacking in merit. Consequently, in accord with recent Supreme Court pronouncements as well as several of our own decisions, the class action—now determined to be "headless" [16]—should be remanded to the district court, retained on its docket for a reasonable time to afford an opportunity for a proper class representative to step forward, and, if no class member intervenes or is an appropriate representative, only then to dismiss the class action and void all class relief.

If Sarah Abron is an inappropriate class representative, we have before us a "headless class action," a certified class whose head has been determined to be an inappropriate representative. *Satterwhite v. City of Greenville*, 557 F.2d 414, 425 (5th Cir. 1977) (Gee, J., dissenting), *vacated, supra*, 578 F.2d 987.[17]

I believe remand to permit an appropriate class representative or representatives

to come forward is required by Supreme Court decisions in *Sosna v. Iowa, supra*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532; *Franks v. Bowman Transportation Co., Inc.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Rodriguez, supra*, 431 U.S. at 406 n.12, 97 S.Ct. at 1898 n.12; *Deposit Guaranty Nat'l Bank v. Roper, supra*, 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427; and *United States Parole Comm'n v. Geraghty, supra*, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479.[18]

Both *Sosna* and *Franks* held that "[a]lthough the named representative no longer ha[s] a personal stake in the outcome, ... 'when the District Court certifie[s] the propriety of the class action, the class of unnamed persons described in the certification acquire[s] a legal status separate from the interest asserted by [the named representative].'" *Franks, supra*, 424 U.S. at 753, 96 S.Ct. at 1258, *quoting Sosna, supra*, 419 U.S. at 399, 95 S.Ct. at 557. Therefore, the Court held, whether such a class would properly be granted relief is an issue quite distinct from the disposition of the representative's capacity to litigate such claims.

In *Geraghty*, the court extended this doctrine by holding that, where no class had been certified, the named plaintiff retained a sufficient stake in the class determination

---

**16.** The headless class concept is apt to engender a sense of ill-ease, and in some applications the sense may have a reasonable foundation. In *Rodriguez*, for example, if the individuals had seasonably moved for, and obtained, class certification, and then, before a trial on the merits of the class claims, the lack of qualifications of the named plaintiffs to represent the class had become indisputably evident, keeping the case alive to permit intervention of a new representative would be much more questionable. With the class claims still only unproven allegations, there would be small reason to give the class preferred "headless" status over all the other potentially discriminated against classes in the whole United States for which no putative class representative had yet emerged.

However, in *Abron*, the headless status for the class makes entirely good sense. The class claims have been tested in the cauldron of a full-fledged trial. The validity of the claims has been established by sound findings of the district judge. It is far more unreasonable to

erect a procedural barrier between a potential plaintiff and established claims, matured rights, than it is to do so when a plaintiff for whom the class has been held open only succeeds to unproven, contradicted assertions.

**17.** For an excellent discussion of some of the issues presented in this section, *see* Tiburzi, *The Headless Class Action: The Effect of a Named Plaintiff's Pre-certification Loss of a Personal Stake*, 39 Md.L.Rev. 121 (1979).

**18.** Such is essentially the purport of *Hill, II, Hill v. Western Electric Co.*, (4th Cir. 1981) (No. 80–1279) in which, following remand of the case primarily responsible for the generation of the issue discussed here, the district court was empowered to permit intervention of proper representatives to fill the gaps created by the earlier holding of this court, *Hill v. Western Electric Co., supra*, 596 F.2d 99, that the individual named plaintiffs who were employees could not adequately represent non-hires.

to permit him to represent the class with respect to the issue on appeal, and even, perhaps, on remand. The Fifth Circuit, sitting *en banc*, has observed:

> Where a class is certified, and class claims tried, before the lack of merit or mootness of the representative's claim is discovered, the class representative has already assiduously asserted the claims of the constituents. The conservation of both litigants' and judicial resources makes it desirable not only to avoid abortion of the litigation but also to prevent prejudice to the members of a certified class who, in the midst of a law suit, suddenly discover that their representative's claim is no longer viable.

*Satterwhite, supra*, 578 F.2d at 994.

Certification having given the class separate legal status, any adverse determination of the standing of Abron as a named plaintiff to represent the class does not moot or destroy the *class*. This the Court made clear in *Franks, Roper* and *Geraghty, supra*. As stated by the Court in *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 756–57 and n.9, 96 S.Ct. 1251, 1260 and n.9, 47 L.Ed.2d 444 (1976) "to 'split up' the underlying case and require that the individual class members begin anew litigation on the sole issue of seniority relief would be destructive of the ends of judicial economy and would postpone indefinitely relief which under the law may already be long overdue." *See also Kremens v. Bartley*, 431 U.S. 119, 134–36, 97 S.Ct. 1709, 1717, 52 L.Ed.2d 184 (1977) (remanding a class action for substitution of named representatives when the named representative and some members of the class had claims that were mooted after trial).

In *Goodman v. Schlesinger*, 584 F.2d 1325 (4th Cir. 1978), and *Cox v. Babcock and Wilcox*, 471 F.2d 13 (4th Cir. 1972), we found that the named representatives were not adequate representatives of a class of discriminatees, since they had suffered *no* discrimination. Yet we did not, as the majority has done here, in similar circumstances, destroy the class claims. Instead, even though no class had been certified, we remanded the cases to the district court to afford an opportunity for a proper class representative to step forward.[19] Here, where not only has a class been certified but trial has been held and the meritorious nature of the class claims established (injunctive relief was granted on the class claims), it is especially grievous to the members of the class now to destroy its legal status because of a supposed technical defect in the representative's standing.

Recently the Fifth Circuit had occasion to reverse a district court decertification order rendered when, after trial, it appeared that the named representative was an improper representative. The court remanded the case for naming of an appropriate representative. According to the court, "decertification of the class and dismissal of the case may work an injustice on those who may have relied on that certification." *Ford v. United States Steel*, 638 F.2d 753, 754 (5th Cir. 1981). *See also Satterwhite* on remand, 634 F.2d at 232 (*en banc*) (instructing trial court to determine, after further hearing, whether a "live" controversy existed, and, if so, whether certification was appropriate, and, if so, who should litigate the class claims). The same is true here.

Finally, as pointed out in *Goodman*, the Supreme Court's citation with "apparent approval" of *Cox* in *Rodriguez*, 431 U.S. at 406 n.12, 97 S.Ct. at 1898 n.12, dictates adherence to such precedent. We are not free to refuse to follow our own cases. *See also Simmons v. Brown*, 611 F.2d 65 (4th Cir. 1979).[20]

---

**19.** Although both *Goodman* and *Cox* require remand regardless of the propriety of the initial certification decision, it is worth emphasizing that the certification decision rendered in the case at hand was entirely proper under Fourth Circuit precedent in existence at that time. *See Barnett, supra.*

**20.** Apart from Supreme Court and Fourth Circuit authority, I believe that in the circumstances of the case, Rule 17 of the Federal Rules of Civil Procedure also suggests the appropriateness of a remand and substitution of a different representative class member if one steps forward. Rule 17 provides in pertinent part:

In sum, finding the class claims to have been substantiated at a trial on the merits, I would affirm, and remand to permit the determination of the various matters as to which the able district judge reserved judgment pending the outcome of this bifurcated appeal.

No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest. .

The effect of the majority holding is that Sarah Abron is an inappropriate class representative because she is not a "real party in interest." However, an action having been brought in a representative capacity, the representative being found on appeal to suffer *limitations*, the class members who relied on the action should not suffer forfeiture of their relief merely because the representative has been found, on appeal, to lack 23(a) standing to represent the class.